T.C. Memo. 2006-76

UNITED STATES TAX COURT

ESTATE OF PEARL I. AMLIE, DECEASED, RODNEY B. AMLIE, EXECUTOR,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 16039-02.                    Filed April 17, 2006.

Robert E. Dallman, Michael G. Goller, and Robert B. Teuber,
for petitioner.

James E. Schacht and Mark J. Miller, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  Respondent determined a Federal estate tax
deficiency of $360,266, and an accuracy-related penalty under

section[1] 6662(a), with respect to the Estate of Pearl I. Amlie

(the estate).[2]  After concessions, the issues remaining for

decision are:

(1) The fair market value of First American Bank Group, Ltd.

(FABG) stock held by Pearl I. Amlie (decedent) at her death.

Subsumed within this issue is the question of whether an

agreement restricting the sale of decedent's FABG stock fixes the

stock's value or should be disregarded in determining value for

Federal estate tax purposes;[3]

(2) the fair market value of five parcels of agricultural

real property (farm land) owned by decedent at her death;

(3) whether the reimbursement by decedent's conservator,

prior to decedent's death, of $30,000 of litigation expenses

---

[1] Unless otherwise indicated, all section references are to
the Internal Revenue Code of 1986 as in effect at the date of
decedent's death, and all Rule references are to the Tax Court
Rules of Practice and Procedure.

[2] In the notice of deficiency, respondent also determined a
fraud penalty of $193,391 under sec. 6663(a).  Respondent has
since conceded the fraud penalty and proceeds on his alternate
determination of an accuracy-related penalty for negligence or
disregard of rules or regulations under sec. 6662(a), confined to
that portion of the underpayment arising from the value reported
for decedent's FABG stock, or $51,571.

[3] The estate argues, in the alternative, that if the value
of the FABG stock is as determined by respondent, then the Rodney
B. Amlie Trust had a claim against the estate of $495,968,
deductible by the estate under sec. 2053(a)(3).  As we decide
this case on other grounds, we find it unnecessary to consider
this argument.

incurred by her son, Rodney B. Amlie (Rod), constituted a gift; and

(4) whether the estate is liable for an accuracy-related penalty of $51,571 under section 6662(a) for underpayment of estate tax attributable to understatement of the value of decedent's FABG stock.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and the accompanying exhibits.

Decedent was a U.S. citizen domiciled in Fort Dodge, Iowa, when she died testate on October 18, 1998. Rod was appointed executor of the estate and continues to function in that capacity. At the time of filing the petition, Rod resided in Humboldt, Iowa.

Introduction

Decedent executed her last will and testament in November 1978. The will included a specific bequest of decedent's farm land to her daughter, Rosemary Ahlerich, and her son, Thomas,[4] in equal shares. The will also included a specific bequest to Rod of a portion of certain bank stock, discussed infra, that decedent held at the time her will was executed. The portion

---

[4] As Thomas predeceased decedent, his interest passed to his two children, Susan Wendel and Thomas Robert Amlie.

left to Rod was such amount as would equal one-half the value of decedent's farm land as valued for Iowa inheritance tax purposes which, in general, is fair market value.[5] After certain other small bequests, the residue of decedent's estate was to go to her three children, Rosemary, Rod, and Thomas, in equal shares. Rod, his wife, and their children were also given the first right to purchase the residual balance of the bank stock not passing to him; i.e., the portion of the stock passing to the residual beneficiaries other than Rod.[6]

In July 1986, decedent executed a codicil to her will that struck all bequests to Rod individually and instead made these bequests to a spendthrift trust, the Rodney B. Amlie Trust (Rod Amlie Trust), created by the codicil for the benefit of Rod.

In 1988, decedent realized she was having difficulty managing her financial affairs, so she filed a voluntary petition for appointment of a conservator. Decedent's initial conservator resigned in 1993 and was replaced by Boatmen's Bank of Iowa, N.A. Decedent remained a ward of the conservatorship for the remainder of her life.

---

[5] See Iowa Code sec. 450.37 (1998 & Supp. 2005). The basis on which to value the bank stock for purposes of this bequest was not addressed in the will.

[6] The price at which Rod and his family members were entitled to purchase the residual balance of the back stock was not addressed in the will.

During the conservatorship, decedent's prospective heirs[7] had frequent acrimonious disputes with respect to her assets. The prospective heirs other than Rod generally distrusted Rod, whom they considered responsible for the FDIC's forced closure of one of the banks decedent owned and Rod had managed. The disputes among the prospective heirs often involved small matters, such as appropriate reimbursements each should receive for travel to visit decedent, use of decedent's lake house, and one prospective heir's purportedly causing the conservatorship to pay his drycleaning bills. In the conservator's opinion, these disputes were highly contentious in view of the amounts involved.

Decedent's Bank Stock

At the time decedent executed her will the stock to be bequeathed consisted of both common and preferred shares of Agri-Bank Corp. (Agri-Bank), Farmers National Bank of Webster City, Iowa, and Commercial State Bank of Pocahontas, Iowa. At some time prior to the appointment of her conservator, decedent's Farmers National Bank of Webster City stock was exchanged for additional shares of Agri-Bank stock, and Commercial State Bank of Pocahontas ceased to exist (having been ordered closed by the FDIC). When decedent's conservator filed the initial report and

---

[7] All references to decedent's "prospective heirs" include her surviving children, Rosemary Ahlerich and Rod Amlie, and her deceased son Thomas's adult children, Susan Wendel and Thomas Robert Amlie.

inventory for the conservatorship, decedent had assets in excess of $1.7 million, including 9,046 shares of Agri-Bank common stock and 13,377 shares of Agri-Bank preferred stock. During decedent's conservatorship various agreements were entered into regarding this stock, as discussed below.

The 1991 Agreement

In 1991, decedent's 9,046 common shares constituted 13.6 percent of the common stock of Agri-Bank. David Hill was the controlling shareholder (with 73.2 percent of the common stock) and president of Agri-Bank. Sometime in 1991, Mr. Hill formed a new holding company called Agri Bancorporation (Agri). Agri offered to exchange one share of Agri common stock and one share of Agri preferred stock for each share of common stock held by Agri-Bank shareholders other than Mr. Hill. In addition, Agri and Mr. Hill sought an agreement for the eventual sale of the Agri stock that decedent would obtain in the exchange.

On August 23, 1991, decedent's conservator, with the approval of the Humboldt County, Iowa, District Court (district court), exchanged decedent's Agri-Bank common stock for 9,046 shares of Agri common stock and 9,046 shares of Agri preferred stock, and entered into an agreement with Agri and Mr. Hill with

respect to decedent's Agri stock and Agri-Bank preferred stock[8] (1991 Agreement).

According to its preamble, the 1991 Agreement's purpose was to restrict the transferability of decedent's shares and provide for their purchase by Agri upon the occurrence of certain events (including decedent's death), as well as to ensure that, in the event a controlling interest in Agri were sold, decedent would receive the same consideration per share for her minority interest as Mr. Hill received for the sale of his controlling interest.

In specific terms, the 1991 Agreement prohibited decedent from transferring her Agri stock[9] without (i) having obtained the consent of Agri and Mr. Hill, or (ii) having offered to sell the stock to Agri at the price contained in any bona fide third-party offer. Under the 1991 Agreement, the conservatorship received put options whereby the conservator could require Agri to purchase all of decedent's Agri common stock for book value, and all of decedent's Agri preferred stock for par plus unpaid dividends. Agri likewise received call options, exercisable

---

[8] Decedent's 13,377 shares of Agri-Bank preferred stock were not exchanged, Agri-Bank having survived the exchange as a subsidiary of Agri.

[9] An exception was made for transfers to decedent's lineal descendants and their spouses, who would be bound by the 1991 Agreement.

during the 1-year period following decedent's death, to purchase all of decedent's Agri stock at the same prices.[10]

Finally, the 1991 Agreement prohibited Mr. Hill from selling his controlling interest to a third party unless decedent were offered the opportunity to sell her Agri stock to the same third party for the same consideration per share (Hill Rights). For this purpose, "consideration" included the value of any noncompete, consulting, or similar arrangements or payments providing financial benefit to Mr. Hill. In addition, if the prospective third-party purchaser of Mr. Hill's controlling interest were to condition the purchase of Mr. Hill's interest upon the right to acquire decedent's shares as well, the 1991 Agreement required decedent to sell her Agri shares (for the prescribed consideration).

One of the conservator's principal considerations in negotiating the 1991 Agreement was to avoid any sale of decedent's stock before her death, after which the basis of that stock would be stepped up to fair market value. By securing a

---

[10] The 1991 Agreement also gave the conservatorship and Agri reciprocal put and call options, respectively, for the sale of all of decedent's Agri-Bank preferred stock at par plus unpaid dividends. These options commenced 1 year after the date of the agreement, and expired 1 year after decedent's death. At some point after the 1-year waiting period and before the appointment of a successor conservator (Boatmen's) in 1993, the put option was exercised with respect to decedent's Agri-Bank preferred shares. The conservatorship kept the proceeds received from the sale in segregated accounts.

guaranteed buyer and price (which, in the event of any change in control, would approximate the per-share price paid for the controlling interest), the conservator also secured a hedge against the risk decedent bore in holding a minority interest in a closely held bank. The conservator was also concerned about liquidity in decedent's estate, which included a number of valuable illiquid assets, as decedent's estate tax liability was expected to be substantial. Concluding that the 1991 Agreement was in decedent's best interest, the district court approved the conservator's application to enter into it.

### The 1994 Agreement

Sometime in 1994 Mr. Hill agreed to sell his controlling interest in Agri, as well as two other banks, to FABG. As consideration, Mr. Hill received book value for his Agri shares (which were exchanged for FABG shares at a ratio reflecting the banks' respective book values), book value for the shares of the other two banks, a 5-year employment contract at $218,000 per year, a $314,000 signing bonus, retirement of certain capital notes held by one of his other banks ($1.6 million), and an option (FACC option) to exchange his FABG stock, 5 years hence, for all of the stock in First American Credit Corp. (FACC), an operating loan subsidiary of FABG. FABG's initial capital funding of FACC exceeded $10.5 million, and Mr. Hill's FACC option agreement required that FABG fund FACC with qualified

assets[11] worth a fair market value of $18.1 million by the time the option was exercisable.

The final merger agreement between Agri and FABG was executed on September 30, 1994. Under the terms of the merger, Agri's minority shareholders were offered the option to either redeem their Agri common stock for book value ($53.55) or exchange their Agri common stock for FABG common stock at a ratio reflecting the banks' respective book values (1.0 Agri share for 0.73597 share of FABG).

In its submission to the Federal Reserve Board concerning the merger, FABG disclosed its obligation pursuant to the 1991 Agreement to pay decedent the same per-share consideration for her minority interest as that offered to Mr. Hill.

The conservator exchanged decedent's Agri common stock at the offered ratio for 6,657 shares of FABG common stock[12] on October 1, 1994, and negotiated an agreement (1994 Agreement) for the postdeath sale of decedent's FABG stock to FABG for 1.25 times book value, or $118.23 per share plus 6 percent compounded annually until decedent's date of death ($118 price). The 1994

---

[11] Qualified assets were defined generally as cash, notes receivable, and other investment assets.

[12] In connection with the merger, FABG also redeemed all outstanding shares of Agri preferred stock (including decedent's) for par plus unpaid dividends through the date of the merger. The conservator deposited the proceeds from this preferred stock redemption into segregated accounts.

Agreement was executed on October 31, 1994 (subject to approval by the district court). The $118 price was intended to compensate for the value of the stock as augmented by the Hill Rights. Specifically, the 1994 Agreement prohibited the transfer of decedent's FABG common stock without FABG's consent and granted reciprocal put and call options to decedent's personal representative and FABG, respectively, to sell or purchase decedent's FABG stock within 60 days after notice of her death for the $118 price.

Cognizant of its fiduciary duties as conservator, Boatmen's Bank of Iowa, N.A. obtained advice from a valuation specialist for closely held business interests at Boatmen's Trust Co., a related entity, in connection with the negotiations resulting in the $118 price. To reach an opinion regarding a fair price for decedent's FABG stock, including the Hill Rights, the valuation specialist reviewed "merger multiples"[13] for other Iowa and Midwest region commercial bank mergers or acquisitions, comparing the size, location, and profitability of the acquired banks with Agri in order to identify appropriate comparables. On the basis of her review, the valuation specialist concluded that Agri was not worth an acquisition premium to FABG, so that a price equal

---

[13] A merger multiple is computed as the ratio of the purchase price for a bank to that bank's book value at the time of acquisition.

to book value was appropriate for decedent's FABG stock, absent the Hill Rights.

Taking into account the additional consideration received by Mr. Hill, the valuation specialist concluded that Mr. Hill had effectively received a price equal to 1.33 times book value for his stock in Agri and his two other banks. However, in the valuation specialist's view, a significant portion of the additional consideration--namely, the retirement of $1.6 million of the capital notes of one of the other banks--was not consideration for Mr. Hill's Agri stock. The valuation specialist also determined that the FACC option given to Mr. Hill (which entitled him to convert his FABG stock to FACC stock in 5 years) had no value, because of the multiple variables that might affect relative values of the FABG and FACC shares in the 5 years prior to the option exercise date (in October 1999). On the basis of her analysis, the valuation specialist concluded that the $118 price (i.e., 1.25 times book value), coupled with the right to defer the sale until after death to avoid capital gains

taxes,[14] constituted a fair price for decedent's FABG stock, including the Hill Rights.

In addition to satisfying itself that the $118 price was fair, the conservator also believed the 1994 Agreement was in decedent's best interest because, in the conservator's judgment, it was imprudent for such a substantial portion of decedent's net worth to be held in the form of a minority interest in a closely held bank. This concern was exacerbated by the merger of Agri into FABG, which transformed decedent's holdings into an even smaller minority interest in a venture with unfamiliar management. In the conservator's view, the 1994 Agreement's guarantee of a fixed price and buyer for decedent's FABG shares established a hedge against decedent's downside risks of holding a minority interest. The conservator also concluded that the 1994 Agreement benefited decedent by securing a right to defer sale until after death to avoid capital gains taxes and to ensure liquidity for decedent's estate to pay estate taxes.

---

[14] Decedent's right under the 1991 Agreement to defer the sale of her bank stock until after death contained an exception. Whereas Agri's call option on decedent's stock under the 1991 Agreement was generally effective only upon decedent's death, in the event of a sale of the controlling interest in Agri, the purchaser of the controlling interest could require the immediate sale of decedent's Agri shares. Thus, the 1994 Agreement secured decedent's right to a postdeath sale of her bank stock, even though the controlling interest in Agri had been sold.

When the conservator sought approval of the district court to enter into the 1994 Agreement, Rod (alone among the prospective heirs) filed formal objections in which he claimed, inter alia, that the proposed $118 price for decedent's FABG stock failed to compensate adequately for the Hill Rights and could result in a potential loss to decedent's estate of more than $500,000. Pursuant to Iowa law, decedent's prospective heirs received notice regarding all aspects of the proceedings concerning approval of the 1994 Agreement.

A hearing was held at which conflicting expert testimony concerning the fairness of the $118 price was received. The experts' fundamental difference centered on the present value of the FACC option given to Mr. Hill. The conservator's expert contended that the present value of Mr. Hill's FACC option was negligible, whereas the expert proffered by Rod testified that the FACC option was worth as much as $500,000 (about $85 per share). A representative of FABG testified that rejection of the 1994 Agreement would lead to further litigation, that decedent would not be offered any option comparable to Mr. Hill's FACC option, and that, if the 1994 Agreement were rejected, FABG would take the position that it was entitled, as Agri's successor, to purchase decedent's stock pursuant to the call option in the 1991 Agreement for book value.

The district court found that the proposed $118 price failed to compensate adequately for the Hill Rights, in particular the FACC option.  The court therefore concluded that the 1994 Agreement was not in decedent's best interest and declined to approve it.

The 1995 Family Settlement Agreement

The conservator filed a motion for reconsideration of the district court decision and, based on its belief that further litigation as to either the 1991 or 1994 Agreements was not in decedent's best interest, commenced negotiations with the prospective heirs to obtain agreement with respect to a price at which decedent's FABG stock could be sold.

The conservator continued to believe that it was imprudent, and potentially a violation of its fiduciary obligations to decedent, to continue to hold such a substantial portion of decedent's net worth in the form of a minority interest in a closely held bank that did not pay dividends.  The conservator likewise considered the deferred sale arrangement in the 1994 Agreement a significant benefit for decedent by virtue of the capital gains tax savings, which might be lost were FABG to successfully exercise any call option that might be available to it under the 1991 Agreement.  The prospective heirs other than Rod preferred a guaranteed "floor" price for decedent's FABG stock rather than the risks inherent in further negotiation

and/or litigation with FABG over a better price; they, like the conservator, were also concerned about liquidity to pay expected estate taxes. The prospective heirs other than Rod were therefore willing to accept the $118 price. Rod, however, believed that the $118 price fell substantially short of the consideration that should be paid for decedent's stock given the Hill Rights, and consequently was unwilling to consent to a sale at that price.

Because of the foregoing problems and concerns, the conservator initiated, and played an integral role in, negotiations among the prospective heirs to reach an agreement under which a secure price for the FABG stock could be obtained for decedent's estate. These negotiations culminated in September 1995 when the prospective heirs executed a Family Settlement Agreement (1995 FSA)[15] that, in broad terms, guaranteed decedent and the prospective heirs other than Rod the $118 price for the FABG stock that was offered previously by FABG.

More specifically, the 1995 FSA prohibited the conservator and decedent from transferring the FABG stock without the consent

---

[15] The agreement was signed by Rosemary Ahlerich; Thomas's children, Susan Wendel and Thomas Robert Amlie; Rod, his wife, and their children; and the three individuals nominated as trustees in the codicil to decedent's will establishing the Rod Amlie Trust.

of Rod, his spouse, their children, and the Rod Amlie Trust (collectively, the Rod Amlie Family). The 1995 FSA further required that all bequests to the Rod Amlie Trust under decedent's will be satisfied "in kind" with FABG stock, valued for this purpose at the $118 price. The 1995 FSA then provided that any FABG stock remaining in decedent's estate after satisfaction of decedent's bequests to Rod would be subject to reciprocal put/call options for a designated postdeath period under which decedent's personal representative could require the Rod Amlie Family to purchase, or the Family could require decedent's personal representative to sell to the Family, the remaining FABG stock at the $118 price. Finally, all rights of the conservator under the 1991 Agreement with respect to decedent's FABG stock (i.e., the Hill Rights) were assigned to the Rod Amlie Family, with all expenses and benefits arising therefrom to inure to the Family.

In addition, the parties to the 1995 FSA agreed that the conservator should withdraw the motion for reconsideration of the district court's decision rejecting approval of the 1994 Agreement, and that the conservator should reimburse (from decedent's assets) litigation expenses of $30,000 incurred by the Rod Amlie Family, $500 for Susan Wendel's time as an attorney, and $500 for attorney's fees incurred by Rosemary Ahlerich, in

connection with the dispute over approval of the 1994 Agreement.[16]

The conservator sought approval of the 1995 FSA, as well as authority to effectuate its terms, from the district court.  On October 16, 1995, the court concluded that the 1995 FSA was in decedent's best interest, approved it, and ordered that "the Conservator is specifically authorized to perform such acts as are necessary to effectuate the terms and conditions of the Family Settlement Agreement"; i.e., the 1995 FSA.

The 1997 Agreements

In August 1997 the Rod Amlie Family reached an agreement with FABG regarding the consideration they would accept for decedent's FABG stock (including the Hill Rights) that the Family would receive through bequest or purchase after her death pursuant to the 1995 FSA.  The price to be paid to the Rod Amlie Family was $217.50 per share plus 4 percent per year after February 28, 1998, compounded semiannually.[17]  FABG paid more for decedent's FABG stock than it would have paid to other minority shareholders in 1997 through 1999 because of the value FABG assigned to the Hill Rights.  Also, one of the principal reasons

_____

[16] It is undisputed that these amounts were paid in 1995 as provided in the 1995 FSA.

[17] The agreed price also included a comparable downward adjustment in the event the stock transfer occurred before Feb. 28, 1998.

FABG agreed to pay more for decedent's stock in 1997 than it offered to pay in connection with the 1994 Agreement was the higher value it assigned to the Hill Rights in 1997.

The agreement reached between the Rod Amlie Family and FABG was effectuated by means of two written agreements: the 1997 Conservator Agreement (between the conservator and FABG) and the 1997 Rod Amlie Family Agreement (between the Rod Amlie Family and FABG). Under the 1997 Conservator Agreement, the conservator agreed not to transfer decedent's FABG stock without the written consent of FABG, and, acknowledging the assignment of decedent's rights under the 1991 Agreement to the Rod Amlie Family pursuant to the 1995 FSA, the parties agreed to mutually release each other from any liability arising from the 1991 Agreement (which conferred the Hill Rights).

Under the 1997 Rod Amlie Family Agreement, the Rod Amlie Family agreed to take all necessary steps to become the lawful owners of all of decedent's FABG stock upon her death, and FABG agreed to redeem thereafter the stock for $1,447,897.50; i.e., $217.50 per share plus 4 percent per year after February 28, 1998, compounded semiannually. The 1997 Rod Amlie Family Agreement further provided that as part of the consideration for the agreement, the parties mutually released each other from any liability arising under the 1991 Agreement (which conferred the Hill Rights). Finally, the 1997 Rod Amlie Family Agreement was

made contingent upon the sale to FABG of certain FABG stock owned by Rod's wife Sally individually.

Decedent's Death

Decedent died on October 18, 1998, at the age of 96. On November 15, 1998, pursuant to the 1995 FSA, the Rod Amlie Trust exercised its call option to purchase all the FABG stock remaining in decedent's estate after satisfaction of the bequests of such stock to the Trust.

On November 17, 1998, the FABG stock at issue was sold to FABG for $1,489,724.93, the price derived under the formula in the 1997 Rod Amlie Family Agreement. Upon receiving the check for this amount from FABG, Rod endorsed it as executor of decedent's estate and had the proceeds segregated into a check made payable to the estate for $993,756.96, the price for the FABG stock under the formula set forth in the 1995 FSA,[18] and a second check for the balance of $495,967.97, which was eventually remitted to the Rod Amlie Trust.

_____

[18] Because the sale of decedent's FABG stock occurred within 30 days of decedent's death (as required by the 1997 Rod Amlie Family Agreement), it had not yet been determined what portion of the stock would pass to the Rod Amlie Trust by bequest (versus exercise of the put/call options), because the size of the bequests was dependent upon the value of decedent's farm land at her death. Consequently, the estate initially received all the proceeds from the sale to FABG (at the $118 price), subject to a distribution of a portion of those proceeds to the Rod Amlie Trust reflecting the shares to which the Trust was entitled by bequest.

Decedent's Farm Land

At her death, decedent's farm land consisted of five parcels (Parcels 1, 2, 3, 4, and 5).  Decedent had a 100-percent undivided interest in Parcels 1 (135.83 acres), 4 (80 acres), and 5 (40 acres); a seven-twelfths undivided interest in Parcel 2 (160 acres); and a one-half undivided interest in Parcel 3 (200 acres).

Estate Tax Return

The estate filed a timely Form 706, United States Estate Tax Return, on July 22, 1999.  The estate elected to use alternate valuation dates; namely, November 17, 1998 (the date on which decedent's FABG stock was purchased by FABG), for the stock, and April 18, 1999 (6 months after decedent's death), for the farm land.  On the return, decedent's FABG stock was valued at $993,757.  The additional $495,968 paid by FABG for the stock was reported as capital gain on the 1998 Form 1041, Fiduciary Income Tax Return, of the Rod Amlie Trust.  The fair market value of decedent's farm land was reported based on an appraisal by an auctioneer, as follows:

| | |
|---|---|
| Parcel 1 | $254,681 |
| Parcel 2 | 167,040 |
| Parcel 3 | 159,000 |
| Parcel 4 | 152,000 |
| Parcel 5 | 20,000 |
| Total | 752,721 |

Notice of Deficiency

On July 17, 2002, respondent timely mailed a notice of deficiency to the estate. Therein respondent determined that the value of decedent's FABG stock on the alternate valuation date was $1,489,725 (its purchase price pursuant to the 1997 Rod Amlie Family Agreement) and accordingly increased the taxable estate by $495,968. In addition, respondent determined the underpayment arising from undervaluation of the FABG stock was attributable to fraud or, in the alternative, negligence or disregard of rules or regulations under section 6662. With respect to decedent's farm land, respondent determined that the fair market values on the alternate valuation date were as follows:

| | |
|---|---|
| Parcel 1 | $308,544 |
| Parcel 2 | 214,368 |
| Parcel 3 | 209,936 |
| Parcel 4 | 172,876 |
| Parcel 5 | 26,000 |
| Total | 931,724 |

Respondent's determinations concerning the farm land increased the taxable estate by an additional $179,003. Finally, respondent determined that the estate failed to report $30,000 of lifetime taxable gifts made by decedent.

Burden of Proof

The revenue agent conducting the examination in this case, Keith Puntenney (Agent Puntenney), initially requested information from the estate's accountant, Wesley Stille, and

ultimately received approximately 280 pages of documents. After reviewing this material, Agent Puntenney had additional questions, and was referred by Mr. Stille to the estate's attorney, David Jennett.

Mr. Jennett made additional materials available, and after reviewing them Agent Puntenney requested an interview with Rod, as executor of the estate. Agent Puntenney's request was not satisfied.

OPINION

I. Burden of Proof

The estate contends that the burden of proof with respect to the factual issues in this case has shifted to respondent pursuant to section 7491(a). We disagree.

To be eligible for the burden-shifting benefits of section 7491(a), a taxpayer must show that the prerequisites set forth in section 7491(a)(2) have been satisfied. Allnutt v. Commissioner, T.C. Memo. 2004-239; Oatman v. Commissioner, T.C. Memo. 2004-236; H. Conf. Rept. 105-599, at 239 (1998), 1998-3 C.B. 747, 993. In particular, section 7491(a)(2)(B) requires taxpayers to cooperate with all reasonable requests by the Commissioner for interviews, documents, and the like.

Respondent contends, inter alia, that the estate failed to cooperate because his request to interview Rod was denied. As our findings indicate, we conclude that Agent Puntenney requested

an interview with Rod, as the executor of decedent's estate, and this request was denied. While Agent Puntenney's notes do not record such a request, he gave credible testimony that he made the request of Rod's advisers (Messrs. Stille and/or Jennett), which is plausible in the circumstances. The estate's response on this point was equivocal. That is, Rod testified that he was not aware of any request that he be interviewed, but when Mr. Stille was immediately thereafter called as a witness by the estate's counsel, he was not questioned regarding whether a request for an interview with Rod had been made to him. Cf. Clifton v. United States, 45 U.S. 242, 247 (1846); Steiner v. Commissioner, 350 F.2d 217, 223 (7th Cir. 1965) (adverse inferences may properly be drawn from taxpayer's failure to call witnesses who would otherwise be expected to be favorable to him), affg. T.C. Memo. 1963-128. On this record, we are persuaded that Agent Puntenney requested an interview with Rod that was not satisfied. Accordingly, the estate has not satisfied the requirements of section 7491(a)(2)(B), and the burden of proof does not shift pursuant to section 7491(a)(1). The estate therefore retains the burden of proof with respect to all factual issues in this case. Rule 142(a).

## II. Fair Market Value of Decedent's FABG Stock

On the estate's Form 706, decedent's FABG stock was valued at $993,757 based on the 1995 FSA price term, which the estate

contends fixed the value for Federal estate tax purposes. Respondent determined that the FABG stock should be valued at the price paid for it by FABG within a month after decedent's death ($1,489,725) and argues in this regard that the 1995 FSA should be disregarded in ascertaining the stock's value for Federal estate tax purposes.

Federal estate tax is imposed on the transfer of the taxable estate of every citizen or resident of the United States. Sec. 2001(a). The taxable estate is defined as the gross estate less allowable deductions. Sec. 2051. The gross estate includes the value of all property owned by a decedent at the time of death. Sec. 2031. In most instances, the value of the gross estate is the fair market value of the included property as of either the date of death, or the alternate valuation date under section 2032 if elected by the executor as is the case here. Sec. 20.2031-1(b), Estate Tax Regs.

An exception to the general valuation rule exists when the property in question is subject to an enforceable restrictive agreement, such as a buy-sell arrangement. See, e.g., St. Louis County Bank v. United States, 674 F.2d 1207, 1210 (8th Cir. 1982). For a restrictive agreement to control value for Federal estate tax purposes, it must meet certain requirements set forth in the regulations and the caselaw. Sec. 20.2031-2(h), Estate

Tax Regs.  We have previously summarized those requirements as follows:

> It is axiomatic that the offering price must be fixed and determinable under the agreement.  In addition, the agreement must be binding on the parties both during life and after death.  Finally, the restrictive agreement must have been entered into for a bona fide business reason and must not be a substitute for a testamentary disposition. * * * [Estate of Lauder v. Commissioner, T.C. Memo. 1992-736; citations omitted.]

Agreements that fail to meet these requirements are disregarded in determining value.  See Estate of Weil v. Commissioner, 22 T.C. 1267, 1274 (1954); sec. 20.2031-2(h), Estate Tax Regs.

Section 2703, enacted in 1990, also governs restrictive agreements.  Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, sec. 11602, 104 Stat. 1388-491.  The general rule of section 2703 is that any agreement to acquire property at less than its fair market value will be disregarded for Federal estate tax purposes unless the agreement satisfies the requirements enumerated in the statute.  Those requisites include the requirements of preexisting law that the agreement be a bona fide business arrangement and not be a testamentary device, as well as a new requirement that the terms of the agreement be comparable to those of similar arrangements entered at arm's length.  Sec. 2703(b).

Further, since section 2703 is meant to supplement, not replace, prior case law,[19] the pre-section-2703 rules requiring that an agreement be binding during life and at death, and contain a fixed and determinable price, continue to apply.  Thus, regardless of whether section 2703 applies to a restrictive agreement, the agreement must satisfy the requirements of pre-section-2703 law to control value for Federal estate tax purposes.  Estate of Blount v. Commissioner, T.C. Memo. 2004-116, affd. on this issue 428 F.3d 1338 (11th Cir. 2005).

The estate contends that the 1995 FSA, with its requirement that the estate satisfy the specific and residual bequests to the Rod Amlie Trust with FABG shares valued at the $118 price, and its reciprocal put/call options requiring the sale at the $118 price of the FABG stock not used to satisfy the bequests, fixed the value of the stock for Federal estate tax purposes, because it is a restrictive agreement that satisfies pre-section-2703 requirements as well as section 2703(b).[20]  Respondent raises

_____

[19] 136 Cong. Rec. 30,488, 30,540-30,541 (1990) (Senate Committee on Finance Explanatory Material in Senate Committee on Budget report printed in the Congressional Record, without separate publication, because of time constraints).

[20] The estate also argues that the portion of the 1995 FSA that made an assignment of the Hill Rights to the Rod Amlie Family is not subject to sec. 2703 because it was a present assignment that did not restrict the future value of the stock. We doubt that a meaningful bifurcation can be made between decedent's FABG stock and the Hill Rights, as the latter
(continued...)

several arguments for disregarding the 1995 FSA, contending that the 1995 FSA fails to satisfy either the pre-section-2703 requirements that it set a fixed and determinable price and be legally binding, or the requirements of section 2703. We address each issue in turn.

Pre-Section-2703 Requirements

Respondent argues that the 1995 FSA did not contain a fixed and determinable price for decedent's FABG stock because it did not give the Rod Amlie Trust "the right to buy any fixed amount of the stock for the price set therein". Respondent observes that the actual amount of decedent's FABG stock the Rod Amlie Trust would acquire by purchase rather than bequest was unknowable until after decedent died and her farm land was valued, because the Trust was bequeathed such stock as would equal one-half the value of the farm land, plus one-third of the residual estate. Indeed, respondent contends, it was possible that none of decedent's FABG stock would be sold pursuant to the options in the 1995 FSA if the value of one-half the farm land plus one-third of the residual estate exceeded the value of the FABG stock (using the $118 price fixed in the 1995 FSA).

---

[20](...continued)
prescribed the consideration that was required to be paid for the former. However, we need not consider this aspect of the estate's argument, given our ultimate conclusion herein that sec. 2703 does not cause any element of the 1995 FSA to be disregarded for Federal estate tax purposes.

The estate argues that it is irrelevant what portion of decedent's FABG stock was subject to sale under the put/call options in the 1995 FSA because any portion passing by bequest was also subject to the price restrictions of the 1995 FSA.  That is because the estate was required under the 1995 FSA to satisfy the specific and residual bequests to the Rod Amlie Trust "in kind" with FABG stock valued at the $118 price.  (The Rod Amlie Trust was likewise bound under the 1995 FSA to accept the stock at this valuation in full satisfaction of the bequests.[21])  The satisfaction of such pecuniary bequests with stock at the fixed $118 price constitutes a sale or exchange for Federal tax purposes, the estate argues, citing principles set forth in section 1.661(a)-2(f)(1), Income Tax Regs.; Kenan v. Commissioner, 114 F.2d 217 (2d Cir. 1940), affg. 40 B.T.A. 824 (1939); and Suisman v. Eaton, 15 F. Supp. 113 (D. Conn. 1935), affd. per curiam 83 F.2d 1019 (2d Cir. 1936).  Since decedent's personal representative was required under the 1995 FSA to exchange FABG stock at the $118 price in satisfaction of the specific and residual bequests to the Rod Amlie Trust, the value of the FABG stock transferred in this manner was also restricted by the 1995 FSA, the estate contends.

_____

[21] In the absence of the 1995 FSA, decedent's will did not address how decedent's FABG stock would be valued for purposes of the Rod Amlie Trust's right to receive FABG stock equal in value to one-half of decedent's farm land.

We agree that the 1995 FSA operated to restrict the value of all of decedent's FABG stock. Under the 1995 FSA, the conservator and decedent were prohibited from transferring decedent's FABG stock without the consent of the Rod Amlie Family. At decedent's death, all of her FABG stock was required to be transferred to the Rod Amlie Trust at the $118 price, either in an exchange at that value to satisfy the bequests or by sale at that price. The 1995 FSA therefore imposed the $118 price as a ceiling (and floor) on the value of decedent's FABG stock. Pursuant to the agreement reached between the conservator and the prospective heirs, the estate could receive no more (and no less) than the $118 price for all shares of decedent's FABG stock, thereby effecting a transfer of the risk of loss or opportunity for gain on the shares from decedent and her estate to the Rod Amlie Trust.

Respondent next argues that the 1995 FSA was not enforceable because the conservator did not sign it. Thus, respondent contends, decedent was not bound by the 1995 FSA, and consequently the Rod Amlie Family had no enforceable right to purchase decedent's FABG stock at the price set forth in the 1995 FSA.[22] We disagree.

---

[22] Respondent also attacks the validity of the 1995 FSA on the grounds that the Rod Amlie Trust had not been created when the agreement was executed. However, the 1995 FSA conferred the
(continued...)

Although not a signatory, the conservator sought approval of the 1995 FSA from the district court. In granting such approval, the court found the agreement to be in decedent's best interest and specifically authorized the conservator "to perform such acts as are necessary to effectuate the terms and conditions" of the agreement. The 1995 FSA prohibited the conservator and decedent from transferring the FABG stock without the consent of the Rod Amlie Family, and it required decedent's personal representative to sell the stock at the price prescribed in the agreement if the Rod Amlie Family exercised its option to purchase. Given the district court's order and the foregoing terms of the 1995 FSA, we are persuaded that decedent and the conservator were legally bound to avoid transfer of the FABG stock without consent during decedent's lifetime, and that the Rod Amlie Family had an enforceable right against decedent's estate to purchase the FABG stock (not passing to them by bequest) at the prescribed price. See Iowa Code sec. 633.71 (1992) (court orders bind conservator); Iowa Code sec. 633.637 (2003) (powers of ward under conservatorship restricted); In re Harker's Estate, 85 N.W. 786,

---

[22](...continued)
purchase option on all members of the Rod Amlie Family, which included Rod as well as the Rod Amlie Trust. Thus, we are unpersuaded that the status of the Rod Amlie Trust at the time of execution of the 1995 FSA defeated the creation of an enforceable right in other members of the Rod Amlie Family (who could have transferred such right to the Trust when it was created).

787 (Iowa 1901) (actions taken on ward's behalf by conservator under the direction of the probate court are binding on ward, absent fraud).[23]

In sum, we conclude the 1995 FSA satisfies the pre-section-2703 requirements that it set a fixed and determinable price, and that it be legally binding during life and at death.

Section 2703 Requirements

Respondent further argues that, even if it is conceded that the 1995 FSA created enforceable buy/sell options establishing a price that bound decedent, the 1995 FSA is nonetheless disregarded for Federal estate tax purposes under section 2703(a), because it fails to satisfy the requirements of section 2703(b) for exempting a restrictive agreement from the "disregard" rule of section 2703(a). The estate contends that all requirements of section 2703(b) have been satisfied, and we agree.

Section 2703(b) provides that a restrictive option or agreement will not be disregarded under section 2703(a) if it meets each of the following requirements:

    SEC. 2703(b). Exceptions.-- * * *

---

[23] Respondent also argues that decedent was not bound by the 1995 FSA because she received no consideration for entering it. We think the consideration received by decedent is patent; namely, a fixed price for the FABG stock that was otherwise contingent upon further negotiations and/or litigation with FABG.

(1) It is a bona fide business arrangement.

(2) It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth.

(3) Its terms are comparable to similar arrangements entered into by persons in an arms' length transaction.

We consider each in turn.

Bona Fide Business Arrangement

To meet the requirement of section 2703(b)(1), a restrictive agreement must further some business purpose. The 1995 FSA represented the culmination of the conservator's efforts, starting with the 1991 Agreement, to secure a guaranteed price and buyer for decedent's minority interest in a bank. The conservator had a fiduciary obligation to serve decedent's best interest, and in the conservator's view, it was imprudent for such a substantial portion of decedent's net worth to be invested in the form of a minority interest in a closely held bank. The 1991 Agreement was the conservator's initial step designed to mitigate the downside risks of decedent's minority stake. Through that agreement, the conservator secured a fixed price and buyer for decedent's Agri stock and a guarantee that, in the event the controlling interest in Agri were sold, decedent would

receive the same per-share consideration for her minority interest as the controlling shareholder received.[24]

The failed 1994 Agreement represented the conservator's continued pursuit of the same goals after the controlling interest in Agri was in fact sold; namely, securing a fixed price for decedent's interests from the new owner (FABG) that, in addition, compensated decedent for her rights under the 1991 Agreement to receive the same consideration for her shares as received by the controlling shareholder; i.e., the Hill Rights.[25] The change in control had exacerbated the conservator's concerns as a fiduciary regarding decedent's minority interest, since decedent's interest in FABG was proportionally smaller than her interest in Agri, and FABG was under unfamiliar management.

When the district court declined to approve the 1994 Agreement based on Rod's objections, the conservator commenced

[24] Although the estate did not proffer the testimony of the conservator who negotiated the 1991 Agreement, we are satisfied from the successor conservator's testimony concerning decedent's circumstances, and the 1991 Agreement itself, that the purpose of the agreement was to benefit decedent by eliminating the downside risks described above.

[25] The conservator also sought to achieve an additional goal in the 1994 Agreement to benefit decedent's interests; namely, the avoidance of capital gains tax liability on the sale of the FABG stock. The 1991 Agreement did not confer any right to defer the sale (until death) of decedent's stock in the event of a sale of the controlling interest in Agri. In providing that FABG's call option was not exercisable until after decedent's death, the 1994 Agreement also implemented the conservator's goal regarding capital gains tax liability.

negotiations in an effort to avoid the expense to decedent of future litigation with FABG over the price to be paid for decedent's shares as enhanced by the Hill Rights.[26] These negotiations produced the 1995 FSA, under which decedent's stock effectively would be sold to the Rod Amlie Family at her death for the same price as FABG had offered in the 1994 Agreement (the $118 price), and the Rod Amlie Family would pursue whatever price it could obtain for the stock from FABG, at the Family's risk and expense.

We are persuaded that the conservator, in securing the 1995 FSA, was seeking to exercise prudent management of decedent's assets by mitigating the very salient risks of holding a minority interest in a closely held bank, consistent with the

---

[26] We agree with the conservator's view that decedent and/or her estate faced significant litigation hazards in this regard. We believe FABG possessed leverage on the basis of the 1991 Agreement provision under which decedent was required to sell her minority stake to any purchaser of the controlling stake if the purchaser conditioned his purchase of the controlling stake on his acquisition of decedent's shares. Also, an official of FABG testified in the proceedings concerning approval of the 1994 Agreement that if the 1994 Agreement were rejected, FABG would take the position that it was entitled, as Agri's successor, to purchase decedent's stock pursuant to the call option in the 1991 Agreement for book value. (This call option was exercisable at decedent's death, and decedent was 92 at the time of the proceedings concerning the 1994 Agreement.) Finally, further negotiations and/or litigation with FABG jeopardized the conservator's goal of avoiding capital gains taxes on the sale of decedent's FABG stock. See supra note 25.

In addition, we are persuaded that the value of the Hill Rights was especially uncertain, in light of the FACC option, the value of which was the subject of conflicting expert testimony in the district court proceedings concerning approval of the 1994 Agreement.

conservator's fiduciary obligations to decedent.[27]  We think these were "valid life oriented business reasons" akin to those underlying the option agreement that passed muster in Cobb v. Commissioner, T.C. Memo. 1985-208 (option agreement allowing below-market purchase at decedent's death served business purpose of encouraging effective management of, and reducing risk of operating, decedent's rental property).

Respondent argues that the 1995 FSA cannot meet the requirement of section 2703(b)(1) because the agreement's subject, decedent's FABG stock, was not an actively managed business interest but merely an investment asset.  We rejected such an argument in Estate of Bischoff v. Commissioner, 69 T.C. 32, 40-41 (1977), and find it equally unpersuasive here.  In our view, an agreement that represents a fiduciary's efforts to hedge the risk of the ward's holdings may serve a business purpose within the meaning of section 2703(b)(1).  In addition, planning for future liquidity needs of decedent's estate, which was also one of the objectives underlying the 1995 FSA, constitutes a business purpose under section 2703(b)(1).  See 136 Cong. Rec. 30,539 (1990).

---

[27] We note in this regard that the district court concluded that the 1995 FSA was in decedent's best interest.

Not a Testamentary Device

The second requirement of section 2703(b) is that the restrictive agreement not be a device to transfer the property subject to the agreement to members of the decedent's family for less than full and adequate consideration in money or money's worth. This requirement existed in pre-section-2703 law, which provides guidance regarding its meaning. Whether a restrictive agreement constitutes a testamentary device depends in important respects on the fairness of the consideration received by the transferor, judged at the time the agreement is entered. See, e.g., Estate of True v. Commissioner, T.C. Memo. 2001-167, affd. 390 F.3d 1210 (10th Cir. 2004); Bommer Revocable Trust v. Commissioner, T.C. Memo. 1997-380.

Respondent contends that decedent received no consideration or benefit from the 1995 FSA, as she owned stock for which FABG was willing to pay $118.23 per share before the agreement, and after the agreement she owned stock that was to be sold for $118.23 per share to Rod. In respondent's view, only Rod benefited from the 1995 FSA as it allowed him to purchase decedent's stock at a price that had been found inadequate by the district court just a few months before.

We disagree with respondent's theory. As noted above, we believe decedent received significant consideration under the 1995 FSA; specifically, a fixed price for a minority stock

interest, the value of which was otherwise uncertain and subject to substantial litigation hazards. Because of the circumstances of the conservatorship, the 1994 Agreement could not be consummated, leaving decedent's net worth exposed to risk that the conservator did not consider prudent. The $118 price reached in the 1994 Agreement and carried over into the 1995 FSA, which approximated 1.25 times book value, was agreed to by the conservator after receiving professional advice that it was a fair price. In reaching that price term in the 1994 Agreement and 1995 FSA, the conservator also had to take into consideration the litigation hazards of a protracted dispute with FABG, as noted above.

Moreover, the prospective heirs other than Rod also agreed to the price in the 1995 FSA. Theirs was an arm's-length decision. To the extent the price in the 1995 FSA undervalued decedent's FABG stock, the prospective heirs other than Rod were thereby penalized and Rod rewarded; that is, Rod would receive a larger number of FABG shares pursuant to the initial bequest under which he was to receive FABG stock equal to one-half the value of decedent's farm land, and the other prospective heirs would be paid less for the FABG stock they received as part of the residual estate but were required to sell to Rod at the 1995 FSA price. These were siblings (including a deceased sibling's adult children) who had a history of acrimonious disputes over

decedent's assets.  We do not believe the prospective heirs other than Rod agreed to the 1995 FSA price in order to effect a transfer to Rod for less than full and adequate consideration. We believe they, like the conservator, were persuaded that the security of a fixed price was preferable to the downside risk and uncertainties of continued negotiations with FABG over the appropriate value of the Hill Rights.

Respondent, with the hindsight knowledge that Rod secured an agreement some 2 years later for FABG's purchase of the same stock at $217.50 per share (plus 4 percent per year until decedent's death, compounded semiannually), seeks to persuade the Court that the 1995 FSA provision to sell at the $118 price must have been a testamentary device to benefit Rod.  The facts of this case do not fit that theory.  The conservator, in an effort to fulfill fiduciary obligations, and the other prospective heirs, in furtherance of their own interests, accepted a price they believed (on the basis of professional advice) was fair at the time and in the particular circumstances.  The purpose of the 1995 FSA, therefore, was not as a testamentary device to benefit decedent's family members.

Comparable Arm's Length Terms

The third requirement of section 2703(b) is that the restrictive agreement's terms be comparable to similar arrangements entered into by persons in an arm's-length

transaction. To satisfy this requirement, the estate offered the expert testimony of an attorney with extensive experience in the purchase and sale of closely held equity interests. In the expert's opinion, the 1995 FSA was comparable to arrangements entered into by persons in arm's-length transactions because the price and structure for the sale of the FABG stock in the 1995 FSA was virtually identical to the terms of the 1994 Agreement, which had been reached in arm's-length negotiations between the conservator and FABG. Respondent argues that the expert's opinion is insufficient for purposes of section 2703(b)(3), because it relies on an "isolated comparable" in contravention of the legislative history of, and regulations under, section 2703(b).[28]

---

[28] Sec. 25.2703-1(b)(4), Gift Tax Regs., provides:

(4) Similar arrangement.--(i) In general. A right or restriction is treated as comparable to similar arrangements entered into by persons in an arm's length transaction if the right or restriction is one that could have been obtained in a fair bargain among unrelated parties in the same business dealing with each other at arm's length. A right or restriction is considered a fair bargain among unrelated parties in the same business if it conforms with the general practice of unrelated parties under negotiated agreements in the same business. * * *
(ii) Evidence of general business practice.-- Evidence of general business practice is not met by showing isolated comparables. * * * [Emphasis added.]

The legislative history of sec. 2703(b)(3) states:

(continued...)

For the reasons discussed below, we conclude that the estate has satisfied section 2703(b)(3). By its terms, the statute requires only a showing that the agreement's terms are "comparable" to similar arrangements entered at arm's length. While the regulations caution against using "isolated comparables", we believe that in context the regulations delineate more of a safe harbor than an absolute requirement that multiple comparables be shown.

In any event, the price terms reached in the 1994 Agreement, and incorporated in the 1995 FSA, were in fact based on a survey of comparables. The conservator sought professional advice from within Boatmen's, and was advised that the $118 price (1.25 times book value) was a fair price for decedent's FABG stock and Hill Rights, when coupled with the deferred sale feature of the 1994 Agreement. The deposition of the valuation specialist who advised the conservator (taken in connection with the district court proceedings) is in the record, and it indicates that the

---

[28](...continued)
> In addition, the bill adds a third requirement, not found in present law, that the terms of the option, agreement, right or restriction be comparable to similar arrangements entered into by persons in an arm's length transaction. This requires that the taxpayer show that the agreement was one that could have been obtained in an arm's length bargain. * * * It is not met simply by showing isolated comparables but requires a demonstration of the general practice of unrelated parties. [136 Cong. Rec. 30,541 (1990); emphasis added.]

specialist considered the merger multiples for all Midwest region banks sold in the prior year and determined that, given the size, location, and profitability of Agri, book value represented the market value of Mr. Hill's FABG shares, and that the additional consideration received by Mr. Hill for his shares represented payment of a premium of 0.33 times book value. In the analyst's view, given that a portion of the premium was attributable to another of Mr. Hill's banks and certain other factors, a premium of 0.25 times book value represented fair, equivalent consideration for the Hill Rights. Thus, several comparables were in fact considered in determining the $118 price for decedent's stock in the 1995 FSA.

Several other indicia in the record support the conclusion that the terms of the 1995 FSA were comparable to arrangements entered into at arm's length. The 1994 Agreement and the 1995 FSA (with their identical price terms) were not agreements reached between decedent and a member of her family. Rather, they were entered into by decedent's conservator, who had a fiduciary duty to safeguard decedent's interests. The conservator and FABG negotiated at arm's length to reach the 1994 Agreement, and the 1995 FSA adopted that agreement's price terms. On this record, we are satisfied that the negotiations among the prospective heirs to reach the 1995 FSA were also arm's length; the interests of the prospective heirs other than Rod were

adverse to Rod's with respect to the price terms for the stock. As discussed above, an understated price in the 1995 FSA would have penalized the other prospective heirs.

Obviously, the fact that the district court concluded in 1995 that the $118 price was inadequate, and the fact that Rod was able to secure a price of $217.50 per share from FABG in 1997, raise questions concerning whether the $118 price in the 1995 FSA was comparable to similar arrangements entered at arm's length. However, on the facts of this case, we are persuaded that the 1995 FSA price terms were arm's length. The prospective heirs other than Rod agreed to the $118 price even though they were aware of the district court proceedings where it was found inadequate. In our view, the other prospective heirs and Rod simply disagreed regarding the potential risks and rewards of further negotiation or litigation with FABG over the value of the Hill Rights.[29] In the circumstances, the other prospective heirs struck a bargain for the proverbial "bird in the hand" of a guaranteed price, transferring to Rod the benefits and burdens of the pursuit of the possible "two in the bush". It may have been a bad bargain in hindsight, but we are persuaded it was arm's length when made.

A second factor also bears on our conclusion. The nub of the differing judgments on the value of the Hill Rights concerned

---

[29] See _supra_ note 26.

the FACC option given to Mr. Hill.  The valuation specialist consulted by the conservator concluded (in the fall of 1994) that the FACC option had no value, because of the multiple variables that might affect the relative values of the FABG and FACC stock during the 5-year period before the FACC option was exercisable (in October 1999).  This view of the value of the FACC option figured prominently in the valuation specialist's conclusion that the $118 price was fair.  Rod's experts disagreed and convinced the district court that the FACC option had significant value.

We are persuaded that the value of the FACC option became easier to discern over time, as the exercise date drew nearer, and that later in the 5-year option period it became clear that FACC stock would be more valuable than FABG stock on the exercise date, rendering the FACC option more valuable.  Indeed, the parties have stipulated that FABG was willing to pay more for decedent's FABG stock in 1997 than it offered in connection with the 1994 Agreement because of the higher value FABG assigned to the Hill Rights in 1997.  Thus, the disparity in the $217.50 per-share price obtained for the stock by Rod in August 1997 and the $118 per-share price in the 1995 FSA is attributable, at least in part, to the passage of time and the apparent appreciation of the FACC stock in relation to the FABG stock over that period, and not to any deliberate undervaluing of the stock in the 1995 FSA. This factor bolsters the conclusion that the terms of the 1995

FSA are comparable to similar arrangements that would have been entered at arm's length. The value of the FACC option was less clear in 1995, and the conservator (as decedent's fiduciary) and the prospective heirs other than Rod preferred to secure an agreement in 1995 rather than risk a protracted dispute with FABG, for the reasons previously discussed.

Finally, FABG's purchase of the FABG stock from the Rod Amlie Family pursuant to the 1997 Rod Amlie Family Agreement was conditioned upon the sale by Rod's wife Sally of certain other FABG stock that she owned in her own right, suggesting that the 1997 price was also affected by FABG's desire to obtain additional stock in the hands of another minority holder.

Conclusion

We accordingly find on this record that the estate has shown that the requirements of section 2703(b) are satisfied, so that section 2703(a) does not provide a basis for disregarding the 1995 FSA. As a consequence, we conclude that the value of decedent's FABG stock as of the alternative valuation date was limited as a result of the 1995 FSA to $993,757, the value reported by the estate.

III. Fair Market Value of Farm Land

Background

The estate reported values for decedent's farm land based on an appraisal by an auctioneer. Respondent determined

deficiencies with respect to Parcels 1-5.[30]  The estate thereafter retained an expert appraiser of agricultural real property, Dennis Reyman, and proffered his expert reports[31] and testimony at trial concerning the fair market value of decedent's farm land.  The fair market values asserted in the return, notice of deficiency, and Mr. Reyman's expert report (without regard to any fractional interest discounts for decedent's interests in the parcels at issue) were as follows:

|  | Estate Tax Return | Respondent's Determination | Estate's Expert |
| --- | --- | --- | --- |
| Parcel 1 | $254,681 | $308,544 | $281,800 |
| Parcel 2 (7/12 interest) | 167,040 | 214,368 | 195,300 |
| Parcel 3 (1/2 interest) | 159,000 | 209,936 | 185,000 |
| Parcel 4 | 172,000 | 198,876 | 198,000 |
| Total | 752,721 | 931,724 | 860,100 |

For Federal estate tax purposes, property is generally included in a decedent's estate at its fair market value.  Sec. 20.2031-1(b), Estate Tax Regs.  The fair market value "is the price at which the property would change hands between a willing

---

[30] Because Parcels 4 and 5 are contiguous, the estate's expert witness treated them as a single parcel, as did the parties thereafter.  We hereinafter refer to Parcels 4 and 5 combined as Parcel 4.

[31] Mr. Reyman prepared two reports regarding decedent's farm land.  The first report documented the results of his appraisal of the fair market value of decedent's farm land without any fractional interest discounts.  Mr. Reyman's second appraisal report contained his conclusions regarding fractional interest discounts for decedent's partial interests in Parcels 2 and 3.

buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts".  See, e.g., United States v. Cartwright, 411 U.S. 546, 551 (1973); sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2501-1, Gift Tax Regs.

The determination of fair market value is a question of fact to be resolved from all the evidence.  Estate of Ford v. Commissioner, 53 F.3d 924, 926 (8th Cir. 1995), affg. T.C. Memo. 1993-580.  Valuation is necessarily an approximation and is, in great part, a question of judgment rather than math or formula. Hamm v. Commissioner, 325 F.2d 934, 940 (8th Cir. 1963), affg. T.C. Memo. 1961-347.  As the estate has not demonstrated that section 7491(a) applies, the estate bears the burden of proving that the values determined by respondent are incorrect.  Rule 142(a).

Evaluation of Expert Testimony

At trial respondent offered the testimony of Agent Puntenney, purportedly as a fact witness, to explain the methodology he employed in reaching the values determined for decedent's farm land in the notice of deficiency.  The estate objected on the grounds that such testimony necessarily involved the presentation of expert opinion, which was impermissible given that respondent had neither established Agent Puntenney's qualifications as an expert nor offered an expert report in

compliance with Rule 143(f).  We sustained the objection insofar as we required Agent Puntenney to confine his testimony to a description of his methodology.

Upon review of Agent Puntenney's testimony and related documents, we find his valuation methodology theoretically sound. We note that his basic approach was similar to that of the estate's expert; namely, a comparison of sales of comparable properties with adjustments for corn suitability ratings (discussed infra).  We also note, however, that Agent Puntenney's sales comparison approach required the selection of comparable properties, an exercise of judgment involving the application of specialized knowledge generally considered expert opinion.  The comparables chosen by Agent Puntenney indicated an average per-acre value of $1,513, whereas the comparables chosen by the estate's expert indicated an average value of $1,397 per acre. The selection of comparables involves real estate valuation expertise that Agent Puntenney was not shown to possess.  Thus, while his conclusions are supportable, we conclude that they are less reliable than those of the estate's expert.

The estate bears the burden of proving that the valuation determinations in the notice of deficiency are incorrect.  Rule 142(a).  The estate relies on the expert reports and testimony of Mr. Reyman.  Mr. Reyman concluded that, in light of the active market in agricultural real estate in Iowa, the sales comparison

approach provided the best indication of value. Respondent does not challenge this point. Mr. Reyman based his appraised values on his analysis of the sales of six comparable properties, the selection of which respondent also does not challenge.

In reaching his valuations for Parcels 1, 2, and 3, Mr. Reyman made certain adjustments to the sales prices of the selected comparables to account for differences from the subject parcels being valued. First, he made a "land mix adjustment" to reflect the differences in the soil composition of the comparable properties as compared to each subject property, based on the county-adjusted corn suitability ratings[32] (CSRs) of each of five classes of soil that might be present in a parcel. Using formulas that allocated a comparable property's purchase price to its various soil types based on their relative values (in accordance with their CSRs), the land mix adjustment employed by Mr. Reyman resulted in adjustments to a comparable property's sale price based upon whether it had a superior or inferior soil composition in comparison to the subject parcel.

Respondent argues that Mr. Reyman's land mix adjustments were overly complex and therefore unreliable, but we find the

---

[32] A corn suitability rating (CSR) is a State government estimate of Iowa soil production potential stated as a standardized index number. The CSR index rates each kind of soil in Iowa for its row-crop production potential; county-adjusted CSR ratings, which provide more precision than State CSR ratings, account for local differences in climate and rainfall.

methodology persuasive.  The algorithms employed in the formulas were discernible and result in adjustments between the comparable and subject properties that appear appropriate.

Mr. Reyman also made another set of adjustments to the comparables for Parcels 1, 2, and 3 to account for "conditions of sale" and location.  We are also generally persuaded of the appropriateness of those adjustments, with one exception.  In the case of one comparable, Mr. Reyman opined that the sale occurred as a result of a public auction where two bidders, both desiring the property because of its proximity to their other holdings, drove the sale price up.  In Mr. Reyman's view, this factor necessitated a $150 per acre downward adjustment in the sales price of the comparable.  Respondent objects,[33] and we agree, in that we are not persuaded that such an adjustment is justified.  As this comparable was averaged with five others, elimination of this $150 downward adjustment raises the indicated per acre value for Parcels 1, 2, and 3 by $25 ($150/6).

We find one other element of Mr. Reyman's methodology troublesome.  Whereas with respect to Parcels 2, 3, and 4, Mr. Reyman took the average of the adjusted per acre values of the six comparables in reaching an indicated value for each subject

---

[33] While respondent contends that the downward adjustment made was $200 per acre, we are satisfied upon review of Mr. Reyman's report that $50 of the adjustment was attributable to the comparable's location rather than the bidders' characteristics.

property, in the case of Parcel 1 he instead selected the adjusted per acre value of a single comparable in reaching his indicated value, on the grounds that this comparable was "the least adjusted comparable sale". Had Mr. Reyman taken the average of the six, his indicated value for Parcel 1 would have been approximately $2,150 per acre, rather than the $2,075 per acre value he derived from using a single comparable. Other than the bald claim that the single comparable he chose was "least adjusted", Mr. Reyman provides no explanation for his departure from the methodology used for the three other parcels. We are not persuaded that such a departure, which reduces the value estimate for Parcel 1 by more than $10,000, is justified. We accordingly conclude that the best indication of Parcel 1's value from this record results from averaging the adjusted values of the six comparables identified by Mr. Reyman.

Values Before Fractional Discounts

Mr. Reyman concluded that Parcel 4 had a value of $198,000 on the valuation date, whereas respondent determined the value at $198,876. Given the proximity of these results, we conclude the estate has not met its burden of showing respondent's determination to be incorrect and therefore sustain it.

Mr. Reyman estimated that Parcel 1 had a value of $281,800 on the valuation date. As discussed above, we conclude that Mr. Reyman should not have made a $150 downward adjustment to one of

the comparables for Parcels 1, 2, and 3, and the elimination of this adjustment raises the indicated value by $25 per acre, or $3,396 for Parcel 1. We also conclude that Mr. Reyman should have utilized the average of the adjusted values of his six comparables for Parcel 1, rather than adopting one comparable. A modification to employ the average raises the indicated value for Parcel 1 by $75 per acre, or $10,187. We accordingly find that the estate has shown respondent's determination to be incorrect, and that the value of Parcel 1 on the valuation date was $295,383.

Mr. Reyman estimated that decedent's seven-twelfths interest in Parcel 2, without regard to any discount for a fractional interest, had a value of $195,300 on the valuation date. He further estimated that decedent's one-half interest in Parcel 3, without any fractional interest discount, had a value of $185,000 on the valuation date. After removing the unjustified $150 downward adjustment to one comparable, the value of Parcel 2 increases $2,325 (7/12 of $25 per acre) to $197,625, and the value of Parcel 3 increases $2,917 (1/2 of $25 per acre) to $187,917. We consider the impact of any fractional interest discounts below.

Impact of Fractional Interests

Since decedent held only seven-twelfths and one-half interests in Parcels 2 and 3, respectively, the estate argues

that fractional interest discounts are warranted because of problems of control, lack of marketability, unavailability of financing, and costs of partition relating to partial undivided ownership interests. This Court has found fractional interest discounts to be appropriate where supported by the evidence. See, e.g., Estate of Campanari v. Commissioner, 5 T.C. 488, 492 (1945); Estate of Henry v. Commissioner, 4 T.C. 423, 447 (1944), affd. 161 F.2d 574 (3d Cir. 1947); Estate of Baird v. Commissioner, T.C. Memo. 2001-258; Estate of Busch v. Commissioner, T.C. Memo. 2000-3; Estate of Pillsbury v. Commissioner, T.C. Memo. 1992-425.

In his first report Mr. Reyman noted that, while fractional interest discounts for Parcels 2 and 3 were appropriate, he lacked adequate information from which he could determine what rate of discount to apply. Mr. Reyman subsequently submitted a second report in which he identified certain fractional interest data he had found which formed a basis for an opinion regarding fractional interest discounts for Parcels 2 and 3. Mr. Reyman acknowledged that his data was remote as to time (consisting of sales in 1996-1998) and location (being from eastern rather than northwest Iowa). He nonetheless believed that the data supported a substantial discount "to compensate potential buyers for the lack of control, limited marketability, and low financing potential characteristic of such interests", and concluded that a

25-30 percent fractional interest discount was appropriate for Parcel 2, and a higher, 30-35 percent discount was appropriate for Parcel 3 because decedent lacked a majority interest in that parcel.

Respondent argues that no fractional interest discount should apply in this case, as the estate has not satisfied its burden of proving that a discount is appropriate. Respondent claims that shortcomings in the comparables that informed Mr. Reyman's analysis demonstrate he is not an expert in the matter of fractional interest discounts. Respondent contends we should therefore accord Mr. Reyman's fractional interest analysis no weight. We disagree.

Respondent presented no evidence from which we could conclude that no discount is appropriate. See Mooneyham v. Commissioner, T.C. Memo. 1991-178. The estate has offered evidence, consistent with common sense and precedent, that some fractional interest discount is appropriate. Mr. Reyman concedes there are considerable shortcomings in his supporting data, and we agree.

The estate's return and petition are admissions that should be binding on the estate absent cogent proof that those reported values were erroneous. See, e.g., Estate of Hall v. Commissioner, 92 T.C. 312, 337-338 (1989); Estate of True v. Commissioner, T.C. Memo. 2001-167; Mooneyham v. Commissioner,

supra.  Considering the unsatisfactory record before us, we conclude that the estate has shown entitlement to a fractional interest discount no greater than that which would reduce the values of Parcels 2 and 3 to the amounts reported on the return.  The evidence of fractional interest discounts supplied by Mr. Reyman is too fraught with infirmities to constitute cogent proof that the reported values are erroneous.  See Estate of Pillsbury v. Commissioner, supra.  We accordingly conclude on this record that the values of Parcels 2 and 3 are subject to fractional interest discounts of approximately 15 percent, which reduces those values to the amounts reported on the return.  We so hold.

IV.  $30,000 Gift

As part of the negotiations that produced the 1995 FSA, it was agreed that the conservator would reimburse various Amlie family members for a portion of the legal expenses each incurred in connection with the proceedings concerning approval of the 1994 Agreement.  As ordered by the district court approving the 1995 FSA, the conservator paid $30,000 to Rod to effectuate the terms of the 1995 FSA.  Respondent determined that the conservator's payment was a gift made by decedent prior to her death.[34]  The estate disagrees, contending that the payment was

---

[34] The conservator was also required to pay $500 each to Rosemary Ahlerich and Susan Wendel in partial reimbursement for legal expenses they incurred in connection with the proceedings for approval of the 1994 Agreement.  Respondent, considering
(continued...)

part of the consideration provided to the Rod Amlie Family to enter into, and accept the responsibilities imposed on them under, the 1995 FSA.  We agree with the estate.

Section 2501(a) imposes a tax on the transfer of property by gift; for purposes of this section, a gift is any transfer of property for less than a full and adequate consideration in money or money's worth.  Sec. 2512(b).  A transfer of property made in the ordinary course of business will be considered as made for an adequate and full consideration in money or money's worth.  Sec. 25.2512-8, Gift Tax Regs.  A transfer in the ordinary course of business is one that occurs as part of "a transaction which is bona fide, at arm's length, and free from any donative intent".  Id.

In deciding the section 2703 issue in the estate's favor, we found that the 1995 FSA was a bona fide business arrangement with terms comparable to those that might be agreed to by persons negotiating at arm's length.  We further held that the agreement was not a device to transfer property to members of decedent's family for less than full and adequate consideration in money or money's worth.  The $30,000 payment by the conservator to the Rod

---

[34](...continued)
these payments de minimis, determined not to recharacterize them as gifts.

Amlie Family was part of the consideration for the 1995 FSA.[35]
Analyzing the 1995 FSA as whole, taking into consideration all
the facts and circumstances surrounding the making of that
agreement, we conclude that this payment was a transfer in the
ordinary course of business and not a gift.  We accordingly do
not sustain respondent's determination that the payment resulted
in a $30,000 increase in decedent's adjusted taxable gifts.

## V.   Section 6662(a) Negligence Penalty

Respondent determined that the estate was liable for an
accuracy-related penalty under section 6662 with respect to the
portion of the underpayment of estate tax attributable to the
value reported for decedent's FABG stock.  Because we have held
that the value of the FABG stock as reported by the estate is
correct, there is no underpayment attributable thereto.
Accordingly, we do not sustain respondent's determination with
respect to the section 6662 accuracy-related penalty.

## VI.  Conclusion

In reaching our holdings in this case, we have considered
all the remaining arguments made by the parties for results
contrary to those expressed herein.  To the extent not discussed

---

[35] Respondent argues that the conservator was under no legal
obligation to make this reimbursement to Rod.  This is incorrect.
Under Iowa law, once the 1995 FSA was approved by the district
court, as a fiduciary of the ward, the conservator was bound to
take those actions required to effectuate the terms of that
agreement on her ward's behalf.  Iowa Code sec. 633.71 (1992)
(court orders bind conservator).

herein, we conclude those arguments are moot, without merit, or unnecessary to reach.

To reflect the foregoing,

<u>Decision will be entered under Rule 155.</u>