T.C. Memo. 2007-107

UNITED STATES TAX COURT

ESTATE OF HILDE E. ERICKSON, DECEASED, DONOR, KAREN E. LANGE,
PERSONAL REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF HILDE E. ERICKSON, DECEASED, KAREN E. LANGE, PERSONAL
REPRESENTATIVE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17982-05, 18003-05.    Filed April 30, 2007.

<u>Phillip H. Martin</u>, <u>Nathan Honson</u>, and <u>John Rock</u>, for
petitioner.

<u>Blaine Holiday</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KROUPA, <u>Judge</u>:  Respondent determined a $734,599 deficiency
in the Federal gift tax and a $718,320 deficiency in the Federal

estate tax of the Estate of Hilde E. Erickson (the estate).[1]
After concessions, we are asked to decide whether property Hilde
E. Erickson (decedent or Mrs. Erickson) transferred to a family
limited partnership shortly before her death is included in her
gross estate under section 2036(a)(1).[2]  We hold that it is.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.
The stipulation of facts and the accompanying exhibits are
incorporated by this reference.  Karen E. Lange (Karen),
decedent's eldest daughter and the personal representative of the
estate, resided in Longboat Key, Florida, when the estate filed
the petition.  Mrs. Erickson resided in Minnesota when she died,
and her estate was admitted to probate in the Steele County
District Court in Minnesota.

### The Erickson Family

Mrs. Erickson and her husband, Arthur E. Erickson (Mr.
Erickson), met at Marquette University, where Mr. Erickson was
studying dentistry and Mrs. Erickson was studying dental hygiene.
Mr. and Mrs. Erickson worked together before they married and,
after they married, moved to Reedsburg, Wisconsin, where Mr.

---

[1]These cases have been consolidated for purposes of
briefing, trial, and opinion.

[2]All section and Code references are to the Internal Revenue
Code, and all Rule references are to the Tax Court Rules of
Practice and Procedure, unless otherwise indicated.

Erickson began his dental practice.  Mrs. Erickson stayed home to raise the couple's two daughters.

Once their daughters were grown, Mrs. Erickson returned to work at Mr. Erickson's dental practice until they both retired in 1974.  Mr. and Mrs. Erickson volunteered in several countries including Madagascar, India, Guatemala, Honduras, and Haiti after they retired.  Mr. Erickson passed away in May 1984.

Mr. Erickson's Will and the Credit Trust

Mr. Erickson's will left most of his assets to Mrs. Erickson.  Mr. Erickson's will also set up a credit trust for Mrs. Erickson's benefit.  The credit trust was intended to provide for Mrs. Erickson's care in the event she depleted her own assets.  Any remaining funds in the credit trust after Mrs. Erickson's death would pass to the Ericksons' daughters free of estate tax.  Mrs. Erickson and Karen were the initial trustees of the credit trust, and the Ericksons' younger daughter, Sigrid Knuti (Sigrid) became a successor trustee several years later.

The Ericksons' Daughters

Karen worked as a benefits and insurance manager for the Owatonna Canning Co., a company her husband's family owned and operated.  Karen's husband, Chad Lange (Chad), was in the third generation of Lange family members to run the canning company, which was sold to Chiquita in 1997.  After the sale to Chiquita, Chiquita hired Karen to work on international business

development, which she did until she retired in 2000.  Chad and Karen have two children, a daughter and a son.

Sigrid did nonprofit work and then moved to Moscow in 1998 with her husband, David Knuti (David), an analyst in the Foreign Commercial Service.  David retired in 2004.  David and Sigrid have three daughters.

Mrs. Erickson's Powers of Attorney

Mrs. Erickson initially granted Karen a durable power of attorney in 1987.  Mrs. Erickson revoked the 1987 power of attorney and executed a new power of attorney in 1994.  The 1994 power of attorney remained in effect as of Mrs. Erickson's death. The 1994 power of attorney granted Sigrid a successor power of attorney and also authorized Karen to make gifts to herself.

Management of Mrs. Erickson's Affairs and Investments

Karen began handling her mother's finances in 1998 or 1999 and signed documents on behalf of her mother when Mrs. Erickson became unable to sign for herself in 1999 or 2000.  Karen began dealing with the credit trust on her mother's behalf and managing the credit trust's investments as well as her mother's own investments in securities and real estate.  Karen also helped move her mother's personal investments in stocks and bonds into brokerage accounts from Mrs. Erickson's safe deposit box.  Around the same time, Karen began managing David and Sigrid's condominium investment when David and Sigrid moved to Moscow.

The credit trust had over $1 million in assets, consisting of marketable securities as well as a Florida investment condominium.  Karen managed the condominium investment when she took over the financial management of the credit trust.  This management duty included tasks such as deciding on renovations, depositing rental checks, and addressing taxes and association fee matters.

Mrs. Erickson's Medical History

Karen first noticed Mrs. Erickson's confusion on a few occasions in the late 1990s and became concerned.  Nurses and doctors also noted a gradual decline in Mrs. Erickson's cognitive powers at about the same time, particularly as it affected Mrs. Erickson's short-term memory.  Mrs. Erickson's doctor confirmed a diagnosis of Alzheimer's disease on March 5, 1999, when Mrs. Erickson was 86 years old.  Mrs. Erickson's Alzheimer's disease continued to progress.  By May 2000, Mrs. Erickson no longer drove or cooked.

Mrs. Erickson's health continued to decline, and the family decided it was best to help Mrs. Erickson move into a supervised living facility.  Mrs. Erickson was experiencing significant difficulties recalling family members, and she was disoriented as to the time, place, and date.  Mrs. Erickson moved into one facility in June 2000 and moved to a different facility in

September 2000. The second facility was able to provide more medical care and a more structured environment for Mrs. Erickson.

Mrs. Erickson also experienced other serious physical problems in 2000 and 2001. She fell and fractured her right hip on September 7, 2000. She fell several additional times over the next few months and required surgery to replace her left hip after a fall in May 2001. Mrs. Erickson's family expected her to live another year or two after the hip surgery. Mrs. Erickson also fractured her collarbone in July 2001. Mrs. Erickson had significant medical expenses, totaling $25,672 in 2000 and $41,791 in 2001.

After Mrs. Erickson was diagnosed with Alzheimer's disease, Merrill Lynch Financial Foundation prepared a report at the family's request regarding Mrs. Erickson's financial situation and planning alternatives and recommendations. The report indicated that Mrs. Erickson desired to maintain a $100,600 annual budget and minimize estate shrinkage. The report estimated that the estate would owe over $500,000 in Federal estate taxes and advised that tax and estate professionals be consulted.

Formation of the Arthur and Hilde Erickson Family LLLP (the Partnership)

Karen originally considered the possibility of forming a family limited partnership in a meeting with counsel in March or April 2001 where Chad and Karen's own financial affairs were

being discussed.  Karen waited to discuss the family limited partnership idea in detail with Sigrid because of the expense of calling Russia to speak with her sister.  Instead, Karen suggested the idea to her sister briefly in an e-mail.  When Sigrid visited her family in Minnesota for Mrs. Erickson's hip replacement surgery in 2001, Sigrid and Karen met with counsel together to talk about a family limited partnership.  Karen also discussed the concept with Mrs. Erickson, but not the financial aspects of the transaction in any detail.

The parties signed the limited partnership agreement creating the Partnership in May 2001.  Karen acted on behalf of her mother and herself and as co-trustee of the credit trust in forming the Partnership.  The same law firm represented all of the parties to the limited partnership agreement although Sigrid informally mentioned the idea to an attorney friend of hers.  Sigrid admitted that she did not understand the particulars of the transaction.  She was aware, however, that a family limited partnership would have estate tax advantages due to valuation discounts that apply to the partnership interests.

The limited partnership agreement provided that Karen and Sigrid were both general partners and limited partners.  Mrs. Erickson (acting through Karen as her attorney-in-fact), Chad, and the trustees of the credit trust (Karen and Sigrid) were limited partners.  Karen signed the limited partnership agreement

in multiple capacities. She signed in her personal capacity as well as co-trustee of the credit trust and as attorney-in-fact for Mrs. Erickson.

The limited partnership agreement provided that Mrs. Erickson would contribute securities plus a Florida condominium she owned in exchange for an 86.25-percent interest in the Partnership. The parties stipulated that the fair market value of these assets Mrs. Erickson contributed was approximately $2.1 million.

The limited partnership agreement also provided that Karen would contribute two partial interests in a Colorado investment condominium she and Chad owned in exchange for a general partnership interest and a limited partnership interest, representing 1.4 percent of the Partnership in the aggregate. Sigrid would contribute two partial interests in a Colorado investment condominium she owned in exchange for a general partnership interest and a limited partnership interest, representing 2.8 percent of the Partnership in the aggregate. Chad would contribute a partial interest in the Colorado condominium he and Karen owned in exchange for a 1.4-percent limited partnership interest. The total of Chad and Karen's contributions equaled a 100-percent interest in the Colorado condominium they jointly owned.

Finally, the limited partnership agreement also provided that the credit trust would contribute a Florida condominium in exchange for an 8.2-percent limited partnership interest. The credit trust did not contribute any of the $1 million in marketable securities it owned to the Partnership. Both Karen and Sigrid were aware that there were no estate tax concerns regarding the assets in the credit trust unlike the estate tax concerns they had regarding Mrs. Erickson's personal assets. Instead, Karen and Sigrid would receive the credit trust assets free of estate tax after Mrs. Erickson's death. They thus opted to leave the credit trust securities outside the Partnership.

Transfer of Assets to the Partnership

Although the limited partnership agreement contemplated that the partners' assets would be contributed to the Partnership concurrently with the signing of the limited partnership agreement, no transfers to the Partnership occurred upon execution of the agreement.

Karen took care of some administrative matters first, such as obtaining a certificate of limited partnership from the State of Colorado and applying for an employer identification number. The certificate of limited partnership listed a Snowmass Village, Colorado, address for service of process, an address that had no mail delivery.

No transfer of assets to the Partnership began for about 2 months.  Karen instructed Merrill Lynch to transfer all of Mrs. Erickson's assets it held, totaling over $1 million in securities, to the Partnership's account in July 2001.  Karen also instructed Wells Fargo to transfer over $500,000 of Mrs. Erickson's assets it held to the Partnership's account.  No other transfers occurred before Karen went to visit Sigrid in Moscow in September 2001, other than the execution of quitclaim deeds relating to the Colorado investment condominiums.

## Mrs. Erickson's Failing Health and the Remaining Partnership Transfers

When Karen returned from her Moscow trip, she visited her mother and noticed that Mrs. Erickson was not feeling well. Karen took Mrs. Erickson to the hospital on September 27, 2001. Mrs. Erickson was suffering from a decreased level of consciousness and pneumonia.  The pneumonia did not appear to be improving, and the family decided to opt for medical care to simply keep Mrs. Erickson comfortable in accordance with her wishes.

The following day, September 28, 2001, while Mrs. Erickson's health was failing, Karen scrambled to make transfers.  Karen, acting on behalf of Mrs. Erickson, executed a deed transferring Mrs. Erickson's Florida condominium unit to the Partnership. Karen, acting as co-trustee of the credit trust, also signed a trustee's deed transferring the Florida condominium unit the

credit trust owed to the Partnership the same day.  Karen, on behalf of Mrs. Erickson, then finalized gifts to Mrs. Erickson's grandchildren by giving limited partnership interests in the Partnership to three trusts for the grandchildren's benefit (the grandchildren's gifts).  These gifts reduced Mrs. Erickson's 86.25-percent interest in the Partnership to only a 24.18-percent interest.

Karen called Sigrid in Moscow on September 28 to tell her that their mother's health was failing.  Sigrid arrived in Minnesota from Russia on September 29, 2001.  Mrs. Erickson died the following morning.

Shortly before she died, Karen, acting as attorney-in-fact, transferred over $2 million of Mrs. Erickson's assets to the Partnership and then substantially reduced Mrs. Erickson's partnership interest by making the grandchildren's gifts.  Most of the retained personal assets, including the substantially reduced retained partnership interest, were illiquid.

Operation of the Partnership and Partnership Transactions

The family continued to operate the Partnership after Mrs. Erickson's death.  The condominiums in Florida and Colorado were managed by the same onsite management companies both before and after they were contributed to the Partnership.  The management companies were responsible for the day-to-day work such as booking reservations, checking in guests, cleaning the units, and

responding to emergencies.  The marketable securities the Partnership held continued to be managed by investment advisers at Wells Fargo and Merrill Lynch after they were contributed to the Partnership.

The Partnership has explored investment opportunities in real estate and has bought and sold some securities.  Over time, the Partnership has become less invested in bonds and more heavily invested in real estate.

The Partnership has made three loans, two of which were to its partners.  The Partnership lent $140,000 to Sigrid to enable her to purchase a Florida condominium in her individual capacity. The Partnership did not take a security interest in the condominium but accepted Sigrid's partnership interest as collateral.  When Sigrid learned that she could receive a more favorable interest rate from a different lender, she brought this to the Partnership's attention, and the Partnership agreed to reduce the interest rate on Sigrid's loan.  Sigrid, acting as general partner of the Partnership, approved both the original loan to herself and the subsequent rate reduction.  The Partnership also lent Chad $70,000.  Sigrid and Chad each repaid the loans timely.

## Administration of the Estate and Payment of Estate Tax Liabilities

Karen was appointed the personal representative of the estate pursuant to Mrs. Erickson's will.  The estate was unable

to meet its liabilities for estate and gift taxes.  To obtain the funds necessary to meet the estate's obligations, Karen engaged in two transactions.  First, she sold Mrs. Erickson's home to the Partnership for $123,500.  Second, the Partnership gave Mrs. Erickson's estate cash totaling $104,000.  The parties characterized the $104,000 disbursement as a redemption of some of Mrs. Erickson's partnership interests.

Respondent's Examination and Tax Court Proceedings

Respondent examined the estate's gift tax and estate tax returns and issued deficiency notices.  The estate timely filed petitions, and the cases were consolidated.  The parties have stipulated the fair market values of the assets Mrs. Erickson contributed to the Partnership and have stipulated the fair market values of the partnership interest Mrs. Erickson retained after making the grandchildren's gifts of partnership interests.

OPINION

We are asked to decide whether the assets Mrs. Erickson transferred to the Partnership shortly before she died are included in her gross estate under section 2036.[3]  Respondent

---

[3]Respondent argues in the alternative that the gross estate includes the property transferred to the Partnership pursuant to sec. 2038.  We find for respondent under sec. 2036 and therefore need not address respondent's argument under sec. 2038.  Respondent also makes two additional arguments in his opening brief, neither of which the estate addressed on brief.  First, respondent argues that the gross estate includes the partnership interests that Karen, acting on behalf of Mrs. Erickson,

(continued...)

argues that Mrs. Erickson retained the possession or enjoyment of, or the right to the income from, the transferred assets. Respondent argues, further, that the assets were not transferred in a bona fide sale for adequate and full consideration.  The estate counters that Mrs. Erickson retained no rights to the assets once she transferred them to the Partnership and, alternatively, that the assets were transferred in a bona fide sale for adequate and full consideration.  We shall consider the parties' arguments after first addressing the burden of proof.

## I.   Burden of Proof

The estate orally moved at trial to shift the burden of proof under section 7491.  We took the oral motion under advisement and now conclude, after carefully reviewing the record, that we must deny the estate's motion to shift the burden of proof.

---

[3](...continued)
transferred to the trusts for Mrs. Erickson's grandchildren (the grandchildren's gifts) under sec. 2035(a) to the extent that the grandchildren's gifts severed the interests Mrs. Erickson retained in her property under sec. 2036.  Second, respondent argues that the gross estate includes the gift tax on the grandchildren's gifts pursuant to sec. 2035(b).  The estate did not address either of these issues at trial or on brief, and we shall treat the estate as having conceded them.  See Rybak v. Commissioner, 91 T.C. 524, 566 (1988).  Finally, the parties do not dispute that the generation-skipping transfer tax under sec. 2601 applies and the amount of this tax will be calculated pursuant to our decision.

The Commissioner's determinations are generally presumed correct, and the taxpayer bears the burden of proving that the Commissioner's determinations are in error.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Section 7491(a) shifts the burden of proof to the Commissioner, however, with respect to a factual issue relevant to a taxpayer's liability for tax under certain circumstances.  The burden shifts to the Commissioner if the taxpayer introduces credible evidence with respect to the issue and meets the other requirements of section 7491(a).  Sec. 7491(a)(2)(A) and (B).[4]

Credible evidence is defined as the quality of evidence which, after critical analysis, we would find sufficient upon which to base our decision.  Higbee v. Commissioner, 116 T.C. 438, 442 (2001); H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995.  Evidence will not meet this standard if we are unconvinced it is worthy of belief.  H. Conf. Rept. 105-599, supra at 241, 1998-3 C.B. at 995.  Moreover, we are not compelled to believe evidence that seems improbable or to accept as true uncorroborated, although uncontradicted, evidence by interested witnesses.  Blodgett v. Commissioner, 394 F.3d 1030, 1036 (8th Cir. 2005) (quoting Marcella v. Commissioner, 222 F.2d 878, 883

---

[4]Sec. 7491 is effective with respect to court proceedings arising in connection with examinations by the Commissioner commencing after July 22, 1998, the date of enactment of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(a), 112 Stat. 726.

(8th Cir. 1955), affg. in part and vacating in part a Memorandum Opinion of this Court), affg. T.C. Memo. 2003-212.

We have carefully reviewed the testimony and exhibits the estate offered. The two witnesses the estate called were Mrs. Erickson's daughters. Both were partners in the Partnership, and one was on all sides of the formation transaction. Karen signed the limited partnership agreement several times in her multiple capacities. While we acknowledge much of the daughters' testimony was uncontradicted, we find their testimony, particularly regarding the rationale for the Partnership and the timelines of the transfers, to be self-serving and, more importantly, not credible. Neither are we required to nor do we accept self-serving testimony we find to be not credible. We find the daughters' testimony represents an after-the-fact rationalization rather than a candid recollection of the facts and circumstances surrounding the transactions at issue. We therefore find that the evidence the estate introduced is not credible.

Accordingly, we conclude that the estate has not met the requirements of section 7491 because the estate has not introduced credible evidence. We therefore shall deny the estate's oral motion to shift the burden of proof under section 7491.

II.  Inclusion of Transferred Assets With Retained Interests in Gross Estate Under Section 2036(a)(1)

We now focus on whether the transferred assets are includable in the gross estate and begin by outlining a few general principles.  The Code generally imposes tax on the transfer of the taxable estate of any decedent who is a United States citizen or resident.  Sec. 2001(a).  The determination of the taxable estate begins with the value of the gross estate, which includes the fair market value of all property to the extent provided in sections 2031 through 2046.  Secs. 2031, 2051.

If a decedent makes an inter vivos transfer of property (other than a bona fide sale for adequate and full consideration) and retains certain specific rights or interests in the property that are not relinquished until death, the full value of the transferred property will generally be included in the decedent's gross estate.  Sec. 2036(a).  The purpose of section 2036(a) is to include in the gross estate those transfers made during a decedent's life that are essentially testamentary in nature.  United States v. Estate of Grace, 395 U.S. 316, 320 (1969).  There are three requirements for the property to be included in a decedent's gross estate under section 2036(a).  First, the decedent must have made an inter vivos transfer of property.  Second, the decedent must have retained an interest or a right specified in section 2036(a)(1) or (2) or (b) in the transferred property that he or she did not relinquish until death.  Finally,

the transfer must not have been a bona fide sale for adequate and full consideration.  Estate of Bongard v. Commissioner, 124 T.C. 95, 112 (2005).

The parties agree that Mrs. Erickson made an inter vivos transfer of assets to the Partnership.  We therefore consider whether Mrs. Erickson retained rights or interests in the property she transferred.  If she did, we then must consider whether Mrs. Erickson's transfer meets the exception for bona fide sales for adequate and full consideration.

A.    Whether Mrs. Erickson Retained Possession or Enjoyment of the Transferred Property

Property is included in a decedent's gross estate if the decedent retained, by express or implied agreement, possession, enjoyment, or the right to income.  Sec. 2036(a).  The term "enjoyment" in section 2036(a) is synonymous with substantial present economic benefit, not speculative and contingent benefit. Estate of Abraham v. Commissioner, 408 F.3d 26, 39 (1st Cir. 2005), affg. T.C. Memo. 2004-39; Estate of McNichol v. Commissioner, 265 F.2d 667, 671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958); Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000).  Part of the possession and enjoyment of one's assets is the assurance that these assets will be available to pay debts and expenses after death.  Strangi v. Commissioner, 417 F.3d 468, 477 (5th Cir. 2005), affg. T.C. Memo. 2003-145.

A decedent retains possession or enjoyment of transferred property under section 2036 where there is an express or implied understanding to that effect among the parties, even if the retained interest is not legally enforceable.  Estate of Maxwell v. Commissioner, 3 F.3d 591, 593 (2d Cir. 1993), affg. 98 T.C. 594 (1992); Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971); Estate of Reichardt v. Commissioner, supra at 151; see also sec. 20.2036-1(a), Estate Tax Regs.  The accounting treatment of the transactions is also not controlling.  Estate of Strangi v. Commissioner, T.C. Memo. 2003-145.

Whether the parties had an understanding amongst themselves is determined from the facts and circumstances surrounding the transfer and the subsequent use of the property.  Estate of Abraham v. Commissioner, supra at 39; Estate of Reichardt v. Commissioner, supra at 151.  No one fact is determinative.  We must carefully scrutinize the facts and circumstances here because intrafamily transactions are involved.  See Estate of Maxwell v. Commissioner, 98 T.C. at 602.  We examine whether the terms and conditions of the transfer of assets to the family limited partnership are the same as if unrelated parties had engaged in the same transaction.  See Estate of Rosen v. Commissioner, T.C. Memo. 2006-115 (citing Estate of Bongard v. Commissioner, supra at 123).

Some factors we have previously considered important in assessing whether a decedent impliedly retained the right to possession and enjoyment of the transferred assets include commingling of funds, a history of disproportionate distributions, testamentary characteristics of the arrangement, the extent to which the decedent transferred nearly all of his or her assets, the unilateral formation of the partnership, the type of assets transferred, and the personal situation of the decedent. Estate of Rosen v. Commissioner, supra; Estate of Harper v. Commissioner, T.C. Memo. 2002-121. The likelihood that an implied agreement will permit the individual to keep using contributed assets is the greatest when the individual conveys nearly all of his or her assets. Estate of Reichardt v. Commissioner, supra; Estate of Rosen v. Commissioner, supra.

Respondent argues that the facts and circumstances indicate Mrs. Erickson retained the right to possess or enjoy the assets transferred to the Partnership pursuant to an implied understanding or agreement among the parties to the transactions. We agree.

We are troubled by the delay in transferring the assets to the Partnership. The delay suggests that the parties did not respect the formalities of the Partnership. Specifically, the partnership agreement provided that the partners would contribute assets concurrently with the execution of the partnership

agreement, yet no assets were transferred then; many transfers occurred only 2 days before Mrs. Erickson died. Although the Partnership had separate accounts from its partners, the record reflects that the partners were in no hurry to alter their relationship to their assets until decedent's death was imminent.

The Partnership also had to provide the estate with funds to meet its liabilities. This fact is telling in two respects. First, disbursing funds to the estate is tantamount to making funds available to Mrs. Erickson (or the estate) if needed. Second, although the estate designated the funds disbursed to the estate as a purchase of Mrs. Erickson's home and a redemption of units rather than a distribution, the estate received disbursements at a time that no other partners did. These disbursements provide strong support that Mrs. Erickson (or the estate) could use the assets if needed.

Finally, the Partnership had little practical effect during Mrs. Erickson's life, particularly because the Partnership was not fully funded until days before she died. Indeed, the Partnership was mainly an alternate method through which Mrs. Erickson could provide for her heirs. Karen, acting on behalf of Mrs. Erickson, transferred substantial amounts of her partnership interests in making the grandchildren's gifts 2 days before she died. Moreover, Mrs. Erickson had been in declining health for some time. She was diagnosed with Alzheimer's disease in March

1999 and died at age 88 after a period of declining health and physical problems.

Although no one factor is determinative, these facts and circumstances, when taken together, show that an implied agreement existed among the parties that Mrs. Erickson retained the right to possess or enjoy the assets she transferred to the Partnership. The transaction represents decedent's daughters' last-minute efforts to reduce their mother's estate's tax liability while retaining for decedent the ability to use the assets if she needed them.

B.   Bona Fide Sale for Adequate and Full Consideration

Having concluded that Mrs. Erickson implicitly retained the enjoyment of the assets she transferred to the Partnership, we must now determine whether the bona fide sale exception of section 2036 applies. Under the bona fide sale exception, transfers a decedent makes before death are not included in the decedent's gross estate if the transfers are bona fide sales for adequate and full consideration in money or money's worth. Sec. 2036(a). We have recently stated that the bona fide sale exception applies if the record shows that a family limited partnership was formed for a legitimate and significant nontax reason and that each transferor received a partnership interest proportionate to the fair market value of the property transferred. Estate of Bongard v. Commissioner, 124 T.C. at 118.

We begin by examining whether the estate has proven that the Partnership was formed for a legitimate and significant nontax purpose. The nontax reason for forming the partnership must have been a significant factor and must be established by objective evidence. Id. The purpose must be the actual motivation, not simply a theoretical justification. Id.

We have identified several factors indicating that a transaction was not motivated by a legitimate and significant nontax purpose. Id. These factors include the taxpayer's standing on both sides of the transaction, the taxpayer's financial dependence on distributions from the partnership, the partners' commingling of partnership funds with their own, and the taxpayer's actual failure to transfer money to the partnership. Id. at 118-119.

We have found a significant nontax purpose where the justification for the transaction was the decedent's personal views and concerns regarding the operation of an income-producing activity and not a business exigency. See Estate of Schutt v. Commissioner, T.C. Memo. 2005-126 (family limited partnership had a significant nontax purpose of facilitating the decedent's buy and hold investment strategy and assuaging the decedent's worry that his heirs would sell his investments after his death). There is no significant nontax purpose, however, where a family limited partnership is just a vehicle for changing the form of

the investment in the assets, a mere asset container.  Estate of Rosen v. Commissioner, T.C. Memo. 2006-115; Estate of Harper v. Commissioner, T.C. Memo. 2002-121.

We now examine both the estate's asserted nontax purposes for forming the Partnership and the objective facts.  While Sigrid admitted at trial that the estate tax advantage of obtaining a decreased fair market value of Mrs. Erickson's assets was certainly a motivating factor, the estate asserts several possible nontax reasons for forming the Partnership.

First, the estate argues that forming the Partnership allowed the family to centralize the management of the family assets and give the management responsibilities to Karen.  We note, however, that Karen already had significant management responsibilities with respect to family assets before the Partnership was formed.  In fact, Karen had held Mrs. Erickson's power of attorney since 1987.  It is not clear from the record what advantage the family members believed they would receive through another layer of "centralized management" of these assets.[5]  Second, the estate argues that the Partnership afforded greater creditor protection.  A creditor who sought funds from

---

[5]The estate does not argue, and we do not find, that the family members decided to form the Partnership to manage Mrs. Erickson's assets after her diagnosis of Alzheimer's disease. Karen had already managed Mrs. Erickson's financial affairs for many years before the diagnosis by serving as attorney-in-fact under a durable power of attorney.

the Partnership, however, would have a significant asset base from which to recover from the Partnership, over $2 million. Finally, the estate argues that the Partnership facilitated Mrs. Erickson's gift-giving plan. Facilitating a gift-giving plan is not a significant nontax purpose. See Estate of Rosen v. Commissioner, supra. We find none of the estate's asserted nontax purposes for forming the Partnership compelling.

Moreover, the facts and circumstances surrounding the transaction also fail to show any nontax purpose for the Partnership. The Partnership was mainly a collection of passive assets, primarily marketable securities and rental properties that remained in the same state as when they were contributed. In addition, the same investment advisers and property managers managed the assets both before and after the transfers to the Partnership. The estate highlights the slight shift in the Partnership's investment allocation from bonds to real estate as proof that the partners made deliberate, businesslike investment decisions. We cannot discern, however, any business goals or any particular reasons for the Partnership to invest in certain assets. We note also that the Partnership made loans to family members and, indeed, in at least one instance, even lowered an interest rate that a partner had previously agreed to pay. We find that the Partnership was a mere collection of mostly passive

assets intended to assist Mrs. Erickson's tax planning and benefit the family.

While Karen and Sigrid discussed the Partnership before it was formed, the circumstances suggest that the Partnership was essentially formed unilaterally, with Karen controlling the transaction. Sigrid admitted at trial that she did not understand the particulars of the transaction, nor is there any credible evidence that Mrs. Erickson understood the transaction. Karen was on every side of the transaction. She acted as attorney-in-fact for her mother, she was the personal representative of her mother's estate, she was both a general partner and a limited partner in the Partnership in her individual capacity, and she was a co-trustee of the credit trust, which was also a partner in the Partnership. Moreover, the same law firm represented all parties to the transaction. While retaining counsel to assist in an important transaction is entirely appropriate, the fact that no family member was represented by different counsel also suggests a unilateral approach to the transaction.[6]

Another key fact indicating that no significant nontax purpose existed was the delay in contributing assets to the

---

[6]Sigrid's informal mention of the arrangement to an attorney friend is not probative. Sigrid admitted that their discussion was informal and that she never signed an engagement letter. Sigrid's own testimony indicates that Sigrid's friend was not acting as Sigrid's attorney in the formation of the Partnership.

Partnership.  The need to manage Mrs. Erickson's assets existed early.  Karen had been assisting her mother for years with her financial affairs.  Despite the need to assist Mrs. Erickson, the partners did not immediately fund the Partnership when they executed the partnership agreement.  Meanwhile, Mrs. Erickson's health continued to decline.  It was only after Mrs. Erickson had been admitted to the hospital with pneumonia, two days before she died, that the partners finally completed their transfers.  While we acknowledge that a few months' delay is not a long time in absolute terms, the months' delay here was significant as it came as Mrs. Erickson's health was declining and ultimately resulted in the family members' finalizing the transfers to the Partnership while Mrs. Erickson was dying in the hospital.  The haste with which they were able to transfer the assets shortly before Mrs. Erickson died belies the estate's argument that the parties needed time to transfer their assets and the delay was out of the partners' control.  Despite Mrs. Erickson being an octogenarian in declining medical health, the parties waited until the prospect of her death loomed to finish the transaction and make sure the partnership affairs were in order.

The estate was financially dependent on the Partnership and needed approximately $200,000 to help pay its liabilities.  We are unpersuaded by the estate's arguments that Mrs. Erickson's death was unforeseen and a decline in the stock market caused her

assets to decrease in value. The record reflects that insufficient assets were left to allow the estate to pay its debts. We acknowledge that the Partnership characterized the disbursements of funds to the estate as a purchase of Mrs. Erickson's home and redemption of some of the estate's partnership interests. The form of the transaction, however, is not controlling. Moreover, the record does not reflect that the Partnership and the estate would have engaged in these transactions absent the estate's need for funds.

Mrs. Erickson's age and health at the time of the transaction strongly indicate that the transfers were made to avoid estate tax. Mrs. Erickson was 88 years old when the parties formed the Partnership in 2001 and had been suffering from Alzheimer's disease for several years. Mrs. Erickson was by then unable to handle her own financial affairs, was no longer cooking for herself or driving, had difficulties recalling family members, and was disoriented regarding the date, time, or place. Mrs. Erickson's age and declining health weigh against a finding that the parties formed the Partnership for any reason other than to help reduce Mrs. Erickson's estate tax liability.

Finally, while it is undisputed that each partner contributed assets of value to the partnership in exchange for his or her partnership interest, the existence of these legitimate transfers of value does not mandate a conclusion that

the bona fide sale exception is met. The transaction must have a legitimate and significant nontax purpose as well as adequate and full consideration. See Estate of Bongard v. Commissioner, 124 T.C. at 118.

We conclude, considering the totality of the facts and circumstances and bearing in mind that no one factor is necessarily determinative, that the estate has failed to show a legitimate and significant nontax purpose for the Partnership, and, therefore, Mrs. Erickson's transfer of assets to the Partnership was not a bona fide sale. The estate failed to identify any legitimate nontax purpose, and the objective facts indicate that no such legitimate nontax purpose existed. Because we have found that Mrs. Erickson's transfer was not a bona fide sale, we need not examine whether adequate and full consideration existed for the transfer. The exception to section 2036 for bona fide sales for adequate and full consideration does not apply.

III. Conclusion

We have found that an implied agreement existed under which Mrs. Erickson retained possession and enjoyment of the assets she transferred. We have also found that the property Mrs. Erickson contributed to the Partnership was not transferred in a bona fide sale. Accordingly, section 2036(a)(1) applies, and the property Mrs. Erickson transferred to the Partnership is included in her gross estate.

To reflect the foregoing and the concessions of the parties,

An appropriate order will be issued denying petitioner's oral motion to shift the burden of proof, and decisions will be entered under Rule 155.