MELLOY, Circuit Judge.
Thomas H. Holman, Jr. and Kim D.L. Holman (the “donors”) created a limited partnership, funded it with common stock of Dell, Inc., and gifted limited partnership shares to their children. In a gift-tax return, the donors asserted lack-of-marketability and minority-interest discounts to claim a value for the gifts substantially below the value of the underlying Dell stock. In doing so, the donors relied in part on transfer restrictions contained in the partnership agreement, asserting that the transfer restrictions would depress the value of the partnership shares relative to the value of the underlying assets.
The Commissioner challenged the return, characterizing the gifts as gifts of Dell stock rather than gifts of limited partnership shares. In addition, the Commissioner applied Internal Revenue Code § 2703 and disregarded the partnership agreement’s transfer restrictions for valuation purposes. Finally, the Commissioner agreed that lack-of-marketability and minority-interest discounts should apply but asserted that the- discounts should be smaller than claimed by the donors.
The Tax Court[1] held that the gifts were gifts of limited partnership shares. The Tax Court also held that the Commissioner correctly applied I.R.C. § 2703 and properly disregarded the partnership agreement’s transfer restrictions. Finally, the Tax Court applied smaller lack-of-marketability and minority-interest discounts than claimed by the donors.
In doing so, the Tax Court adopted the lack-of-marketability discount as asserted by the Commissioner’s expert based on historical studies of restricted stock sales. The Tax Court noted that the partnership held only highly liquid, easily valued assets and that the agreement contained a consensual dissolution provision and granted broad management discretion to the general partners. According to the Tax Court, because economically rational actors would take advantage of the dissolution provision to dissolve and reconstitute the partnership or otherwise buy out a departing partner, there was a natural cap on any lack-of-marketability discount.
On appeal to our court, the Commissioner does not challenge the determination that the gifts were gifts of partnership shares. The donors challenge the Tax Court’s application of I.R.C. § 2703, its determination of marketability and minority-interest discounts, and its overall valuation determination. We affirm the judgment of the Tax Court.
I. Background
The donors amassed wealth primarily in the form of Dell stock during Thomas’s tenure as a Dell employee. They sought to transfer wealth to their children, preserve wealth within their family, and prevent their children from dissipating assets. At the same time, they sought to teach their children basic investing principles and impart to their children a general understanding of responsibility attendant to wealth. As part of an overall estate-planning process seeking to achieve these goals, Thomas and Kim met with counsel and developed an estate and gifting plan that involved execution of wills, creation of the limited partnership, transfer of Dell stock into the limited partnership, and transfer of limited partnership shares to a trustee and conservator for the children. The children, who already owned some *766 Dell stock through the trustee and conservator or in accounts under different states’ versions of the Uniform Transfers to Minors Act, transferred their Dell stock into the partnership in exchange for additional partnership shares.
Several provisions of the partnership agreement are material to the issues in this appeal. Section 3.1 lists the purposes of the partnership:
3.1 Purposes. The purposes of the Partnership are to make a profit, increase wealth, and provide a means for the Family to gain knowledge of, manage, and preserve Family Assets. The Partnership is intended to accomplish the following:
(1) maintain control of Family Assets;
(2) consolidate fractional interests in Family Assets and realize the efficiencies of coordinated investment management;
(3) increase Family wealth;
(4) establish a method by which gifts can be made without fractionalizing Family Assets;
(5) continue the ownership of Family Assets and restrict the right of non-Family persons to acquire interests in Family Assets;
(6) provide protection to Family Assets from claims of future creditors against Family members;
(7) provide flexibility in business planning not available through trusts, corporations, or other business entities;
(8) facilitate the administration and reduce the cost associated with the disability or probate of the estates of Family members; and
(9) promote the Family’s knowledge of and communication about Family Assets.
Section 6.1 grants the general partners “exclusive management and control of the business of the Partnership” including “the power and authority ... to determine the investments and investment strategy of the Partnership.” Sections 8.4 and 9.1 provide that limited partners may not withdraw from the partnership or involuntarily or voluntarily assign or encumber their limited partnership interests except as permitted by the agreement. Section 9.2 describes various permitted assignments such as assignments to family members or assignments to trusts or to certain custodians where such trusts or custodians hold the partnership interests exclusively for the benefit of family members. Section 9.3, which we address in more detail below, describes conditions under which the partnership may acquire partnership interests that are lawfully assigned in a manner prohibited by the agreement. Finally, section 12.1 provides that the partnership may be dissolved by the written consent of all partners.
Section 9.3 provides that the partnership has an option to purchase at an appraised value any partnership interest assigned in a manner that is prohibited by the agreement but that is otherwise lawful. Specifically, section 9.3 provides that the partnership may purchase such an interest over a five-year period at a determined interest rate with a ten-percent down payment. Further, the partnership may assign the right to acquire such an interest to one or more current partners. Finally, the partners may consent to let the prohibited assignee become a limited partner. If the partners refuse such consent and elect not to exercise the right to acquire the assigned shares, the otherwise impermissible holder of the assigned shares does not gain the rights of a limited partner. Rather, such a holder gains merely the limited right to receive distributions to which the assignor-partner would have been entitled.
The gifts of partnership shares occurred in 1999, 2000, and 2001. In gift tax returns for these years, the donors claimed *767 overall discounts of slightly over 49% relative to then-prevailing market prices for the underlying Dell stock. These discounts were based on appraisal recommendations that considered minority status and lack of marketability. These discounts also took into consideration the perceived impact of sections 8.4 and 9.1-9.3 upon the value of limited-partnership shares. In notices of deficiency, the Commissioner initially asserted that it would be proper to allow an overall discount of 28% for minority status and lack of marketability. The Commissioner based this lower discount on the view that the partnership units “should be valued without regard to any restriction on the right to sell or use the partnership interest within the meaning of [I.R.C. § 2703(a)(2)].”
Ultimately, when the ease progressed before the Tax Court, the Commissioner employed an appraiser and argued that an even smaller discount should apply. The donors also employed an appraiser, and the appraisers’ methods were detailed and require some discussion. We describe their methods and their detailed opinions below in the section of our analysis addressing the valuation.
In testimony before the Tax Court, the donors described their purposes for creating and funding the partnership, gifting shares to their children, and including transfer restrictions in the partnership agreement. Neither donor claimed an intent to maintain Dell stock as the sole asset of the partnership nor described any particular investment strategy they intended to employ, other than a future intent to diversify the portfolio’s holdings. Neither donor claimed an intent to hold anything other than passive investments in the partnership nor described any business activity related to the partnership. Between formation of the partnership and the submission of the case, the partnership held only Dell stock. The total amount of stock the partnership held represented approximately 0.28 % of the outstanding stock of Dell, and the parties agree that the broader market could easily absorb this amount.
Mr. Holman testified as to the goal of asset preservation, and the Tax Court interpreted this to mean protection of assets from dissipation by the children. Mr. Holman explained his understanding of sections 9.1-9.3 and how these sections would preclude the children from assigning or giving away their interests. Mrs. Holman testified that the purpose of the partnership was “to be able to teach ... [the] children about wealth and the responsibility of that wealth.”
In light of the purposes stated in section 3.1 of the Agreement, and in light of the donors’ testimony, the Tax Court concluded:
We believe that paragraphs 9.1 through 9.3 were designed principally to discourage dissipation by the children of the wealth that Tom and Kim had transferred to them by way of the gifts. The meaning of the term “bona fide business arrangement” in section 2703(b)(1) is not self apparent. As discussed supra, in Estate of Amlie v. C.I.R., [91 T.C.M. (CCH) 1017, 2006 WL 995337], we interpreted the term “bona fide business arrangement” to encompass value-fixing arrangements made by a conservator seeking to exercise prudent management of his ward’s minority stock investment in a bank consistent with his fiduciary obligations to the ward and to provide for the expected liquidity needs of her estate. Those are not the purposes of paragraphs 9.1 through 9.3. There was no closely held business here to protect, nor are the reasons set forth in the Committee on Finance report as justifying buy-sell agreements consistent with petitioners’ goals of educating their children as to wealth management and *768 “disincentivizing” them from getting rid of Dell shares, spending the wealth represented by the Dell shares, or feeling entitled to the Dell shares.
We find that paragraphs 9.1 through 9.3 do not serve bona fide business purposes. Those paragraphs do not constitute a bona fide business arrangement within the meaning of section 2703(b)(1).
Holman v. C.I.R., 130 T.C. 170, 195, 2008 WL 2189089 (2008).
The Tax Court also concluded that the restrictions were merely a testamentary device such that the donors failed to satisfy § 2703(b)(2). The Tax Court did not reach the arms-length transaction test of § 2703(b)(3). Having determined that the transfer restrictions of sections 9.1-9.3 were to be disregarded for valuation purposes, the Tax Court assessed the remaining aspects of the competing experts’ valuation opinions. The Tax Court accepted lack-of-marketability discounts of 12.5% for each tax year and minority-interest discounts of 4.63-14.34%, all as asserted by the Commissioner’s expert. The donors appeal.
II. Discussion
a. I.R.C. § 2703
Restrictions on the sale or use of property generally tend to depress the value of the property. Oftentimes, such restrictions serve legitimate business purposes, impose actual and meaningful limitations on the use or transferability of property, and are accepted by parties dealing with one another in arms-length transactions. When carefully crafted and applied in certain circumstances, however, such restrictions can minimize the tax consequences of gifts or transfers without imposing substantial additional limitations on the transferability or use of the property. This is particularly true in the context of family transfers where a donor may hold some degree of practical control over a recipient’s actions, even in the absence of formal restrictions, and where transactions often do not occur at arms length. In this context and in others, Congress has expressed concern over the abusive use of such restrictions. See, e.g., Explanatory Material Concerning Committee on Finance 1990 Reconciliation Submission Pursuant to House Concurrent Resolution 310, 136 Cong. Rec. S 15629-04, S15681 (1990) (“Finance Committee Report”) (“[T]he committee is aware of the potential of buy-sell agreements for distorting transfer tax value. Therefore, the committee establishes rules that attempt to distinguish between agreements designed to avoid estate taxes and those with legitimate business agreements. These rules generally disregard a buy-sell agreement that would not have been entered into by unrelated parties acting at arm’s length.”).
In attempting to sort between permissible and impermissible uses of such restrictions, Congress repealed an earlier Code provision, I.R.C. § 2036(c) (1987) because “the committee [was] concerned that the statute’s complexity, breadth, and vagueness posed an unreasonable impediment to the transfer of family businesses.” Finance Committee Report, 136 Cong. Rec. S15680. In 1990, Congress enacted in its place a statute that broadly prohibits consideration of restrictions for valuation purposes, see I.R.C. § 2703(a), but allows taxpayers to prove eligibility for an exception that permits valuation based on such restrictions, see I.R.C. § 2703(b).
To be eligible for the exception and gain the benefit of having such restrictions considered for valuation purposes, the taxpayer must satisfy a three-part test: the restriction must be “a bona fide business arrangement,” it must not be “a device to transfer such property to members of the decedent’s family for less than full and adequate consideration,” and its terms *769 must be “comparable to similar arrangements entered into by persons in an arms’ length transaction.”[2] Because we conclude that the Tax Court correctly held the present restrictions are not “a bona fide business arrangement” in accordance with § 2703(b)(1), we address only that first part of the test.
The ultimate question of whether there was a bona fide business arrangement is a question of fact to be reviewed for clear error. See Estate of True v. Comm’r, 390 F.3d 1210, 1218-19 (10th Cir.2004) (holding that the question of whether an “agreement was entered into for bona fide business reasons and is not a testamentary substitute” is a question of fact reviewed for clear error); cf. St. Louis County Bank v. United States, 674 F.2d 1207, 1210-11 (8th Cir.1982) (affirming a finding that stock-purchase agreement “had a bona fide business purpose” but finding an outstanding question of fact as to whether it was merely a testamentary transfer).
As noted, the Tax Court in the present case viewed the restrictions as failing the “bona fide business arrangement” test. The Tax Court emphasized Mr. Holman’s testimony in which he failed to identify any current or planned activity by the partnership other than holding passive investments without a clearly articulated investment strategy. In addition, he made clear that asset preservation meant preservation from dissipation by the children, not the pursuit of any particular investment strategy. Mrs. Holman emphasized the personal goals of educating the children as to financial responsibility.
In support of the opposite conclusion, the donors cite several Tax Court cases addressing the business-purpose element of § 2703(b)(1) or similar clauses in other provisions of the Tax Code. The donors argue the Tax Court in the present case applied an overly restrictive definition for the phrase “business arrangement” and effectively imposed an “operating business nexus” or requirement that the underlying partnership be an actively managed enterprise. The donors also argue that the “business arrangement” test should be applied looking solely at the taxpayer’s stated intentions and at the language of the restrictions in the partnership agreement without considering the actual context of this case and the nature of the underlying assets. The donors sum up their position in their brief, asserting that “the nature of the assets of the Partnership is irrelevant for purposes of determining whether the restrictions in paragraphs 9.1 and 9.3 constitute a bona fide business arrangement. There is no dispute that the Partnership was an enterprise with the business purpose of generating profits through long-term growth.”
We agree with the Tax Court’s conclusion and reject the donor’s attempt to characterize the Tax Court’s opinion as creating an “operating business nexus.” *770 In answering the question of whether a restriction constitutes a bona fide business arrangement, context matters. Here that context shows that the Tax Court correctly-assessed the personal and testamentary nature of the transfer restrictions. Simply put, in the present case, there was and is no “business,” active or otherwise. The donors have not presented any argument or asserted any facts to distinguish their situation from the use of a similar partnership structure to hold a passbook savings account, an interest-bearing checking account, government bonds, or cash. We and other courts have held that “maintenance of family ownership and control of [a] business” may be a bona fide business purpose. St Louis County Bank, 674 F.2d at 1207; see also Estate of Bischoff v. Comm’r, 69 T.C. 32, 39-40, 1977 WL 3667 (1977). We have not so held, however, in the absence of a business.[3]
That is not to say we necessarily believe it will always be easy to apply § 2703(b)(1) or that investment-related activities cannot satisfy the subsection (b)(1) test. When the restrictions at issue, however, apply to a partnership that holds only an insignificant fraction of stock in a highly liquid and easily valued company with no stated intention to retain that stock or invest according to any particular strategy, we do not view this determination as difficult. See, e.g., Higgins v. Comm’r, 312 U.S. 212, 217-18, 61 S.Ct. 475, 85 L.Ed. 783 (1941) (holding in another context that merely keeping records and collecting interest and dividends did not amount to “carrying on a business”); Estate of Thompson v. Comm’r, 382 F.3d 367, 380 (3d Cir.2004) (“Other than favorable estate tax treatment resulting from the change in form, it is difficult to see what benefit could be derived from holding an untraded portfolio of securities in this family limited partnership with no ongoing business operations.”).
One case the donors cite in support of their position is Estate of Amlie v. C.I.R., 91 T.C.M. (CCH) 1017, 2006 WL 995337 (2006). There, the Tax Court found that a buy — sell agreement was a bona-fide business arrangement where a fiduciary had entered into the agreement to ensure the ability to sell stock that represented an otherwise illiquid minority interest in a closely held bank. Id. at *12. The Tax Court viewed this purpose as patently business oriented and likely necessary to ensure that the fiduciary could fulfill his duty of protecting the beneficiary by ensuring the ability to sell the underlying assets. Id.
Here, in contrast, the donors did not enhance the liquidity of an otherwise illiquid asset through their actions nor do they claim their actions were necessary as a matter of business necessity to ensure a market for the assets. The underlying Dell stock is widely held, easily valued, and highly liquid. The donors placed it into the partnership thereby burdening it with illiquidity as part of an overall estate and *771 gift planning process. As such the donor’s reliance on Amlie is misplaced.
In Estate of Bischoff v. Comm’r, 69 T.C. 32, 1977 WL 3667 (1977), the question was whether the price contained in a buy-sell agreement regarding limited-partnership shares was controlling for valuation purposes. In that case, the Tax Court stated, “the cases have held that the maintenance of family ownership and control constituted a legitimate business consideration.” Id. at 39^40. The underlying asset in Bischoff was “a pork processing business organized, controlled, and managed by three families” who sought “to assure their continuing ability to carry on their pork processing business without outside interference, including that of a dissident limited partner.” Id. at 40. In Bischoff then, there was a perceived risk of an outsider interfering with management.
There is no similarity between the facts of Bischoff and the present case because limited partners in the Holman partnership held little-to-no ability to interfere with asset management. Further, the donors have made no allegation that they, as the general partners, are skilled or savvy investment managers whose expertise is needed or whose investment philosophy needs to be conserved or protected from interference as might justify placement of stock assets into the partnership. Finally, the assets of the partnership — passively held Dell stock — are not assets with which an outsider or dissident owner might interfere. In the quantities held by the partnership, the value of the underlying assets are largely unaffected by the individual actions of the general partners or other owners of relatively insignificant fractions of outstanding stock (unlike the actions of potentially dissenting co-owners of a pork-processing enterprise).
Arguably, the strongest cases for the donors are a line of cases involving investment entities with restrictions imposed to ensure perpetuation of an investment model or strategy. See Estate of Black v. Comm’r, 133 T.C. 15, 2009 WL 4796690 (2009); Estate of Murphy v. United States, No. 07-CV-1013, 2009 WL 3366099 (W.D.Ark. Oct. 2, 2009); Estate of Schutt v. Comm’r, 89 T.C.M. (CCH) 1353 (2005). The donors cite Schutt for the proposition that relatively inactive investment trusts or shells involving restricted rights may nevertheless involve legitimate business purposes and gain favored tax treatment. In making this point, the donors again attempt to portray the present Tax Court opinion as imposing an “operating business nexus” arguably contrary to Schutt. These cases, however, are more nuanced than the donors assert, and each involves unique facts not present in our case.[4]
In Schutt, the Tax Court addressed a different code section, but one of the underlying questions at issue was similar: whether the transfer of publicly traded stock into a business trust was a bona fide sale for full and adequate consideration. Id. at *18 (discussing the “bona fide sale” exception to 26 U.S.C. § 2036(a)). Under relevant Third Circuit authority, the Tax Court viewed this requirement as having a good faith element and also a “legitimate business purpose” element. Id. at *19-20 (applying Estate of Thompson, 382 F.3d at 383). Regarding the legitimate business purpose, the Tax Court ultimately concluded that the maintenance and perpetuation of a specific buy-and-hold investment strategy was, in that case, a legitimate *772 business purpose. Id. at *25. The court based its decision on an express factual finding that the transferor’s primary objective was to preserve his very specific investment strategy. Id. In so holding, however, the Tax Court appeared to recognize that it was approaching an outside limit as to the meaning of legitimate business purpose and noted the “unique circumstances of this case.” Id. In fact, the court noted the general position that “the mere holding of an untraded portfolio of marketable securities weighs negatively in the assessment of potential nontax benefits.” Id.
The facts of Schutt did not end up being as unique as suggested, and the Tax Court and a district court subsequently reached similar results in Murphy and Black. In Estate of Erickson v. Comm’r, 93 T.C.M. (CCH) 1175 (2007), however, the Tax Court distinguished Schutt, effectively illustrating an important difference between cases like Schutt and the present case:
We have found a significant nontax purpose where the justification for the transaction was the decedent’s personal views and concerns regarding the operation of an income-producing activity and not a business exigency. There is no significant nontax purpose, however, where a family limited partnership is just a vehicle for changing the form of the investment in the assets, a mere asset container.
Id. at *10 (internal citations omitted).
Here, as in Erickson, the family partnership is “a mere asset container.” Id. The donors do not purport to hold any particular investment philosophy or possess any particular investing insight. The present partnership agreement does not require that the general partners retain the Dell stock held by the partnership and the donors apparently intend to diversify their investments, although they have articulated no time frame or strategy for doing so. The donors admit that holding Dell stock as the exclusive asset of the limited partnership is not part of an overall, long-term plan. Here, then, unlike Schutt, the family membership, educational, and tax-reduction purposes overshadow any claim of a business purpose for the restrictions.
If anything, the important rule that we believe may be taken from Schutt and cases like it is that context matters such that it is appropriate to defer to the reasoned judgment and fact-finding ability of the Tax Court. In this regard, we note that -in St. Louis County Bank, our case that set forth two of the three steps that Congress subsequently adopted in § 2703(b), we clearly emphasized the importance of context in this factually intense inquiry. We emphasized that the transaction at issue had taken place in the context of a donor who was facing a present heart condition and had a history of heart conditions suggesting a predominately testamentary motive to the transactions. St. Louis County Bank, 674 F.2d at 1210. In the present case, looking at the entirety of the surrounding transactions — including the contemporaneous execution of wills, Mr. Holman’s understanding of the potential tax benefits of his actions, Mrs. Holman’s educational goals, and the absence of any business activity' — -we find ample support for the Tax Court’s determination. When viewed in this context, there is little doubt that the restrictions included in the Holmans’ limited partnership agreement were not a bona fide business arrangement, but rather, were predominately for purposes of estate planning, tax reduction, wealth transference, protection against dissipation by the children, and education for the children.[5]
*773 b. Valuation
In the Tax Court, the parties disagreed as to the value of the underlying Dell stock on the dates of the gifts as well as the appropriate marketability and minority-interest (lack-of-control) discounts. On appeal, aside from the § 2703 issue, the donors challenge only the Tax Court’s determination of a marketability discount. The determination of an appropriate discount is a question of fact that we review for clear error. Estate of Ford v. Comm’r, 53 F.3d 924, 926-27 (8th Cir.1995).
The donor’s expert, Mr. Ingham, and the Commissioner’s expert, Mr. Burns, employed methodologies that were similar in part. They looked to studies comparing the private sales of restricted, unregistered stock in public companies with contemporaneous, unrestricted sales of registered stock in those same companies. According to the experts, although these studies were not perfect analogs for sales of partnership interests, they did serve as examples providing insight as to price discrepancies between freely transferable stock in publicly traded companies and less marketable versions of the same stock, thereby illustrating pricing discounts that could be attributed to the absence of ready market.
The Tax Court agreed with the experts that the studies were useful, and we also agree. In general, Securities and Exchange Commission (SEC) rules limit owners’ ability to sell unregistered stock in public companies other than (1) sales to institutional buyers, or (2) sales subject to certain holding periods. Rule 144, adopted in 1972, imposed a two-year holding period on the resale of restricted stock. 17 C.F.R. § 230.144 (1972); 37 Fed.Reg. 591 (Jan. 14, 1972). Rule 144A, adopted in 1990, permits qualified institutional buyers to buy and sell unregistered, restricted stock. 17 C.F.R. § 230.144A (1990); 55 Fed.Reg. 17933-01 (April 30, 1990). In 1997, the SEC amended Rule 144 to reduce the holding period from two years to one year. 17 C.F.R. § 230.144 (1997); 62 Fed.Reg. 9242-01 (Feb. 28,1997).
The experts’ opinions in the present case differed in the degree of detail with which they discussed these evolving rules and the general inferences about marketability discounts that might be drawn from sales throughout the years that these rules were in effect. Mr. Ingham studied a sample of transactions with median and mean discounts of 24.8% and 27.4%, respectively. He then concluded, without additional quantitative explanation, that qualitative differences between the restricted-stock studies and the present, limited partnership situation justified a marketability discount of 35%. Mr. Burns criticized this upward adjustment as speculative and unsupported. The Tax Court agreed with Mr. Burns and rejected Mr. Ingham’s conclusion, noting that it “need not rely on the *774 unsupported assumption of an expert witness.”
Mr. Burns examined restricted-stock sales with greater detail. He looked at sales during separate windows of time corresponding to the SEC’s adoption of its different regulations. Mr. Burns explained that marketability discounts as per the studies included holding-period components and liquidity components.[6] He observed that for sales of restricted stock between 1972 and 1990, when there was a two-year holding period and no institutional-buyer market, the sale price for restricted shares was, on average 34% lower than sales of corresponding unrestricted shares. He then noted that between 1990 and 1997, when a limited market was created among institutional buyers, the average price difference between restricted stock and corresponding non-restricted stock was 22%. He opined that the 12% difference in these two periods of time was reflective of the fact that buyers demanded a 12% discount to account for the lack of a secondary market. He concluded that the remaining portion of the discounts observed in the studies were due to holding-period restrictions not applicable in the context of the Holman partnership shares. He concluded, therefore, that the 12% lack-of-market or liquidity discount was similar to what private buyers of the limited-partnership shares would demand.
Mr. Burns continued his analysis by explaining why he believed it was appropriate to accept a marketability discount in the range of 12% rather than adjusting this amount substantially upward. Looking at the terms of the Agreement, he found a natural limit or cap on any discounts. He discussed the fact that the Agreement permitted all shareholders, by unanimous agreement, to dissolve the partnership and that it permitted partners or the partnership to buy out an exiting partner. He also noted the ease with which the value of the underlying assets could be determined on any given day. He opined that if outside buyers were to demand too great a discount relative to the then-prevailing price of Dell stock, economically rational insiders would have a clear incentive to step into the void and purchase the exiting partner’s shares at a lesser discount, thereby providing a cap or ceiling to any potential discount.
The donors on appeal do not vigorously defend their expert’s opinion regarding a 35% discount based on studies of restricted-stock sales. They do not claim that their expert disagreed with Mr. Burns’s characterization of marketability discounts as including holding-period and liquidity components. Nor do they discuss their expert’s failure to address this distinction. They do note that their expert’s opinion is commensurate in scope with the discounts Mr. Burns cited for restricted stock sales between 1972 and 1990. They do not point to anything in the record, however, suggesting that Mr. Ingham based his overall recommendation on the prevailing discount from that era.
The donor’s primary argument on appeal focuses on the later aspect of Mr. Burn’s opinion discussing what insiders likely would do in the face of potentially large discounts in partnership share price relative to Dell stock prices. The donors argue that this line of reasoning violates the hypothetical willing buyer/willing seller test by asking what the partnership or particular family members in this case would do rather than asking what hypothetical buyers and sellers would do. See Treas. Reg. § 25.2512-1 (“The value of the property is the price at which such property would change hands between a *775 willing buyer and a willing seller, neither being under any compulsion to buy or to sell, and both having reasonable knowledge of relevant facts.”); id. § 2512-3 (“The fair market value of any interest in a business, whether a partnership or a proprietorship, is the net amount which a willing purchaser, whether an individual or a corporation, would pay for the interest to a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.”).
When assessing hypothetical transactions between hypothetical buyers and sellers, it is improper to ascribe motivations that are personal and reflective of the idiosyncracies of particular individuals. See Estate of Jung v. Comm’r, 101 T.C. 412, 438, 1993 WL 460544 (1993) (refusing to cast a family corporation as the willing buyer where the attempt to do so was based on the non-economic-based view that the family corporation would purchase an interest merely to keep ownership within the family); Propstra v. United States, 680 F.2d 1248, 1251-52 (9th Cir.1982) (refusing to cast executor and beneficiaries as hypothetical willing sellers to avoid “delicate inquiries into the feelings, attitudes, and anticipated behavior of those holding undivided interests in ... property.”). Rather, it is necessary to view such persons as economically rational actors possessing all relevant information and seeking to maximize their gains. See Estate of Jameson v. Comm’r, 267 F.3d 366, 370 (5th Cir.2001) (“The buyer and seller are hypothetical, not actual persons, and each is a rational economic actor, that is, each seeks to maximize his advantage in the context of the market that exists at the date of valuation.”); Curry’s Estate v. United States, 706 F.2d 1424, 1431 (7th Cir.1983) (“[T]he sole relevant consideration in determining whether the company here should be valued as liquidated or as a going concern is which alternative could be expected to yield the profit-maximizing result .... [T]he subjective intention or ‘idea’ of this particular plaintiff corporation ... is irrelevant.... To hold otherwise would be to command future juries to wade into the thicket of personal corporate idiosyncrasies and non-market motives as part of their valuation quest ....”) (emphasis added); Estate of Newhouse v. Comm’r, 94 T.C. 193, 218, 1990 WL 17251 (1990) (“The hypothetical willing buyer and seller are presumed to be dedicated to achieving the maximum economic advantage.”).
Here, we believe the Tax Court’s approach in adopting Mr. Burns’s analysis comports with this general rule of casting the potential buyer merely as a rational economic actor. A buyer possessed of all relevant information would know that (1) the underlying assets are highly liquid and easily priced; (2) the amount held by the partnership could be absorbed by the broader market and represents but a small fraction of the total outstanding market capitalization of Dell corporation; (3) the partnership agreement permits the buying out of exiting partners or dissolution upon unanimous consent of all partners; and (4) there would be little or no economic risk and likely no additional capital infusion necessary for remaining partners to buy out an exiting partner.
Against this backdrop, it is not necessary to look at the personal proclivities of any particular partner or the idiosyncratic tendencies that might drive such a specific person’s decisions. Rather it is only necessary to examine what is technically permissible in accordance with the agreement and forecast what rational actors would do in the face of a pending sale at a steep discount relative to net asset value. Simply put, the Tax Court did not ascribe personal non-economic strategies or motivations to hypothetical buyers; it merely *776 held that, presented with the opportunity, rational actors would not leave money on the table.
We affirm the judgment of the Tax Court.

. The Honorable James S. Halpern, United States Tax Court.

. Section 2703 provides:
(a) General rule. — For purposes of this subtitle, the value of any property shall be determined without regard to—
(1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or
(2) any restriction on the right to sell or use such property.
(b) Exceptions. — Subsection (a) shall not apply to any option, agreement, right, or restriction which meets each of the following requirements:
(1) It is a bona fide business arrangement.
(2) It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money’s worth.
(3) Its terms are comparable to similar arrangements entered into by persons in an arms’ length transaction.

. In St. Louis County Bank, for example, the transferred interests were shares in a family company that had started out as a moving, storage, and parcel-delivery business and evolved into a real estate management company. St. Louis Bank, 674 F.2d at 1208-09. When engaged in the moving and storage business, the company had created a stock-purchase agreement based on a valuation formula keyed to income. Id. at 1209. Later, the family exited the moving and storage business but kept the business structure as a vehicle for renting real estate. Id. With this new activity, the formula resulted in a dramatically lower value. Id. We stated, "We have no problem with the District Court’s findings that the stock-purchase agreement provided for a reasonable price at the time of its adoption, and that the agreement had a bona fide business purpose — the maintenance of family ownership and control of the business. Courts have recognized the validity of such a purpose.” Id. at 1210.

. These cases address a slightly different, albeit similar, question under I.R.C. § 2036(a), the presence of a "legitimate business purpose.” We, nevertheless, feel compelled to comment on these cases because they do not stand for the apparently broad proposition the donors would have us adopt, namely, that holding investments for gain necessarily satisfies the "bona fide business arrangement” test.

. Given our resolution of the "business arrangement” issue, we need not address the additional requirements of § 2703. Our elec *773 tion not to address these issues, however, should not be interpreted as implicit agreement with the dissent. We note that the Tax Court elected not to decide the § 2703(b)(3) requirement regarding the comparability of terms to those found in arms-length transactions. The dissent, however recites limited agreement between the parties’ experts on this issue as recognized in dicta from the Tax Court. We are compelled, therefore, to note that we do not believe the parties’ experts were as aligned on this issue as suggested by the dissent. For example, the Commissioner’s expert opined that "when you look at the overall context ... the issue of [transfer restrictions] wouldn’t arise, because nobody at arm’s length would get into this deal.” He later stated, ”[B]ased on my experience ... I couldn't find anybody who would do this deal, who would let their client into a deal like this as a limited partner without writing a very large CYA memo, saying: 'We advise against this.' ” Given this disagreement and the absence of a Tax Court ruling, we believe it is prudent not to address the § 2703(b)(3) requirement on appeal.

. Mr. Ingham appears to have conceded that Mr. Burns was correct in this qualitative explanation for different components of overall marketability discounts.